UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

YANI ONG,                                              Civil Action No.: 21-cv-2644

                              Plaintiff,               **AMENDED COMPLAINT**

            -against-
                                                       *Jury Trial Demanded*
DELOITTE CONSULTING LLP,

                              Defendant.
_____X

PLAINTIFF YANI ONG, by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This is civil action brought on behalf of Plaintiff Yani Ong against Defendant Deloitte Consulting LLP, ("Defendant Deloitte") for gender, pregancy, and disability discrimination and retaliation in violation of Title VII and the Americans with Disabilities Act, and against Defendant Deloitte for gender and disability discrimination and retaliation in violation of the New York State Human Rights Law and the New York City Human Rights Law, together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over Plaintiff's claims under Title VII of the 1964 Civil Rights Act, 42 U.S.C § 2000, *et seq.* and the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.*

1

3.      The Court has supplemental jurisdiction over Plaintiff's state and city law claims, specifically the New York State Human Rights Law, NYS Executive Law § 296, *et seq.* and the New York City Human Rights Law, Administrative Code of the City of New York § 8-101, *et seq.* pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PROCEDURAL REQUIREMENTS

5.      Plaintiff filed a charge of unlawful discriminatory practice relating to employment because of sex and disability and retaliation with the Equal Employment Opportunity Commission ("EEOC") on November 25, 2019.  On September 28, 2020, the EEOC determined that there was "reasonable cause to believe that [Defendant] has discriminated against [Plaintiff] on account of her sex and pregnancy and retaliated against [her] for complaining about this discrimination." By notice dated December 9, 2020, the EEOC issued a Notice of Right to Sue. The notice was emailed to Plaintiff via her attorney for the first time on December 29, 2020, with an incorrect date of December 9, 2020. A copy of the notice and determination are attached to this Amended Complaint as **Exhibit 1**.  The Complaint in this matter was filed within 90 days of receipt of the Right to Sue Letter.

## PARTIES

6.      Plaintiff Party Yani Ong ("Plaintiff") is a female who resided in New York, New York at all relevant times. Plaintiff was subject to disability, sex and pregnancy discrimination at Deloitte Consulting LLP.

7.      Plaintiff was, at all times relevant herein, Defendant's "employee" within the

2

meaning of all relevant federal, state and local laws, including, but not limited to, Title VII.

8.      Upon information and belief, at all times herein, Defendant Deloitte Consulting LLP ("Deloitte") was and is a corporation registered to do business in New York. Upon information and belief, Defendant's national headquarters is located at 30 Rockefeller Plaza, 41st Floor, New York, New York 10112.

9.      Defendant was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant federal, state and local laws, including but not limited to, Title VII.

## FACTUAL BACKGROUND

### Plaintiff Has Significant Experience in Her Field

10.     On or about July 2015, Plaintiff was hired at Defendant as a strategy manager owing to her significant experience in the field. As a strategy manager, Plaintiff advised corporate clients in various industries on their strategy, including but not limited to strategic options, market entry, and mergers and acquisitions strategies.

11.     Plaintiff was hired as a full-time employee of Defendant with a full-time salary. At Defendant, Plaintiff, like other Deloitte consultants, was normally assigned to external projects, and on limited occasions, assigned to internal projects.

12.     Upon information and belief, external projects are more valuable than internal projects, because Defendant is paid by an outside company for the employees' work on external projects, which resulted in higher profits for Defendant.

13.     At Plaintiff's annual reviews, one of the major factors on which she was evaluated against her peers was how many hours she had billed on external projects versus internal projects, which was referred to as her utilization rate.

14.     It is commonly understood amongst the staff that external projects are valued more by Defendant than internal projects, as they bring in money.

15.     Indeed, Defendant applies different charge codes for time spent on external projects, internal projects, and business development.  Time spent on business development gets a 0% credit towards the performance review and external projects get significantly more credit than internal projects.

16.     The more time that an employee spent on external projects, the higher their promotions, raises, and bonuses.

17.     Each strategy manager, such as Plaintiff, was assigned a Counselor, who was a higher-level executive supervisor responsible for helping their career progression at Defendant and guiding them to obtain projects that allowed them to receive promotions, raises, and more responsibility at Defendant. Plaintiff was assigned to Counselor Joseph Zale ("Counselor Zale").

18.     Defendant's Human Resources Department is known as the "Talent Team," and Plaintiff's contact within this Department was Talent Team Manager Lorin Niedbala ("Talent Team Manager Niedbala").  The "Leaves Team" was responsible for paperwork related to all leaves, including leaves of absence, maternity leave, sick leave, administrative leave, and paid time off.

19.     From the moment Plaintiff began work at Defendant, she had an excellent track record of completing client projects to the highest standards and received praise and bonuses reflecting the same.

## Plaintiff Becomes Pregnant and Informs Her Employer

20.     In or about April 2017, Plaintiff informed Counselor Zale that she was pregnant, and Counselor Zale offered his congratulations.

4

21.     Also, in or about April 2017, Plaintiff informed Talent Team Manager Niedbala that she was pregnant, who directed her to inform the Leaves Team.

22.     Plaintiff immediately informed the Leaves Team that she was pregnant.  The Leaves Team gave Plaintiff information on maternity leave and other health benefits from Defendant's policy manual.

**Plaintiff Is Thrilled to Be Chosen for the Chemical Company Project**

23.     In or about early June 2017, Akshay Seshadrinathan, the coordinator for a project with a prominent chemical company ("Coordinator Seshadrinathan") told Plaintiff that he had chosen her to work on a project known as the "Chemical Company Project," after she had an interview for the project.

24.     Plaintiff was excited that Coordinator Seshadrinathan had chosen her for the Chemical Company Project because she had particular expertise concerning the industry related to this project and had worked in this industry prior to working for Defendant.

25.     Plaintiff was especially excited because it was an external project and the project was a prestigious one that would offer her higher compensation, more responsibility, and raise her profile within Defendant, which would allow her to advance at Defendant.

26.     Coordinator Seshadrinathan knew that Plaintiff had this expertise and chose her for the project because of this. They began discussing specific technical issues related to the project and Coordinator Seshadrinathan was already impressed with Plaintiff's knowledge of the industry.

27.     Coordinator Seshadrinathan asked Plaintiff to start the selection process for an analyst/associate for the Chemical Company Project. Plaintiff interviewed analysts/associates for the job and hired Nick Graziano ("Analyst Graziano") to work on the project.

28.     In one conversation concerning the project, Plaintiff informed Coordinator Seshadrinathan that she was pregnant, and he also offered his congratulations.

29.     On or about June 15, 2017, Plaintiff told Coordinator Seshadrinathan that while she was working on the Chemical Company Project, she could travel to the job site until approximately September 22, 2017, because of her pregnancy and then she could work remotely until approximately November 10, 2017, if the project went beyond the October deadline.

30.     Coordinator Seshadrinathan assured Plaintiff that this was entirely acceptable because late September would either be after Plaintiff's work was completed, or, if it was not, she could work remotely until the end of the project.

31.     On or about June 15, 2017, Plaintiff, along with her co-worker, Analyst Graziano, received a "Welcome to the team" email from Gabriella Campana, upon information and belief, an acting Project Manager for the Chemical Company Project ("Manager Campana"). Manager Campana requested Plaintiff submit any time off she planned to take during the course of the project to her, which Plaintiff promptly did.

32.     In addition, Coordinator Seshadrinathan informed Plaintiff over the phone and by email that she should report to the site for her first day on the project on July 10, 2017.

33.     Plaintiff then had several additional discussions with Coordinator Seshadrinathan regarding the project.

34.     She prepared for the Chemical Company Project by reviewing significant background material from Coordinator Seshadrinathan and, as he instructed her to do, she spent a significant amount of time familiarizing herself with the Chemical Company.

35.     Plaintiff stated to Coordinator Sashindrinathan that she would be able to travel to the site Monday through Thursday, and most Fridays, if necessary.  Upon information and belief,

6

as per Defendant's office-wide policy, during projects employees typically worked on-site with clients Monday through Thursday and worked remotely, from home, or from their assigned home office on Fridays.

36.     At the same time, Manager Campana emailed Plaintiff thanking her for submitting her paid time off days, personally welcoming her again to the team, and instructing her to complete the security clearance for the client's site.

### Plaintiff is Removed from the Project Due to Her Pregnancy

37.     On July 7, 2018, Plaintiff had not heard from Coordinator Seshadrinathan, which was unusual, and she emailed him to request the travel details to the project's site because she was supposed to report to the site on July 9, 2018.

38.     Coordinator Seshadrinathan replied, telling Plaintiff to "hold off on booking travel" and to contact Counselor Zale, who also happened to be a leading partner assigned to the Chemical Company Project, about the assignment.

39.     Later that day, Counselor Zale informed Plaintiff that she was being removed from the project due to her pregnancy.

40.     Counselor Zale told Plaintiff that the project was "demanding" and since she was pregnant, she should not work on the project for "her own benefit."  Counselor Zale also said that she was taken off the project because there would be "too much travel" for her because she was pregnant.

41.     Plaintiff was devastated that she was taken off the project simply because she was pregnant even though she was fully capable of performing the duties of the project.

42.     However, Plaintiff did not feel comfortable directly objecting to the obvious pregnancy discrimination because Counselor Zale was responsible for advancing her career at

Defendant and she wanted to avoid further reprocussions.

43.     Plaintiff told Counselor Zale that she was confident that she could work on the project despite being pregnant and said that it would be difficult for her to find another project now that she was taken off the Chemical Company Project.

44.     Counselor Zale responded that since Plaintiff did have experience in the field, he would speak to the Project Managers to see if there "could be a different role" for her on the project that wasn't actually "part of the team."  Plaintiff never heard anything back about "a different role."

45.     During a follow up call, Plaintiff informed Counselor Zale that she still was not assigned to a project and that she was likely going to be forced to accept an internal project. Counselor Zale responded that she could take internal projects, and the call ended.

### Plaintiff Looks Desperately for Another Project and Accepts a Less Prestigious "Internal Project"

46.     After Defendant removed Plaintiff from the Chemical Company Project because of pregnancy discrimination, Plaintiff desperately looked for work on another prestigious external project, but suspiciously, was not chosen for any of the external projects.  Upon information and belief, she was not chosen because of her known pregnancy and obvious due date.

47.     Plaintiff was extremely depressed and anxious that she was not able to find any external projects because she worried about the advancement of her career.

48.     Because of Defendant's pregnancy discrimination, Plaintiff was forced to accept an internal project within Defendant, which was far less prestigious than the Chemical Company Project that she was taken off because she was pregnant.

49.     Between August and October 2017, Plaintiff worked on this internal project, which she completed exceptionally and with high performance reviews. Counselor Zale told

8

Plaintiff that the team leaders thought she did excellent and stellar work.

**Plaintiff is Diagnosed With Breast Cancer and Delivers Her Baby**

50.     In or about early November 2017, before Plaintiff was scheduled to give birth, she was diagnosed with breast cancer.

51.     Plaintiff delivered her baby on November 18, 2017, and approximately the day after the baby was born, she went on maternity leave.

52.     Plaintiff also had her first course of treatment for cancer at the end of December 2017.

53.     Plaintiff was on maternity leave for six weeks-from November 2017 to mid-January 2018.

**Plaintiff Learns She is Not Being
Promoted Due to Defendant's Discrimination**

54.     In or around January 2018, while she was still on maternity leave, Plaintiff had her annual performance review.

55.     On a phone call, Counselor Zale told Plaintiff that she had been ranked below her peers because she "had not shown her ability to deal with external clients." Obviously, Plaintiff would have gotten a higher ranking had Defendant allowed her to perform on the Chemical Company Project and she was being penalized because Defendant had not allowed her to perform on the Project due to her pregnancy.

56.     Plaintiff's lower ranking resulted in a loss of a promotion, financial loss, and impacted her career progression.

57.     Plaintiff knew that she could have received a higher review if Defendant had not discriminated against her due to her pregnancy and removed her from the Chemical Company Project, a prestigious external project, that past July.

58.     While she was on maternity leave, Defendant refused to give Plaintiff a bonus, which she had received the previous year and which is a customary compensation component for consulting managers working for the Defendant.

**Plaintiff Reports to Defendant that
She has Cancer and They Deny Her Reasonable Accommodations**

59.     Plaintiff took additional FMLA leave starting in mid-January, however immediately before her maternity leave, Plaintiff learned that she had cancer and needed to take FMLA leave through May 2018.

60.     In or about March or April 2018, while she was on FMLA leave, Plaintiff informed Counselor Zale that she had cancer and had received treatment while she was on maternity and FMLA leave. She also told him that she would be undergoing further cancer treatment and she was considering her options in terms of how she should return to work after her FMLA leave expired on May 7, 2018.

61.     She requested from Counselor Zale the accommodation of a "phased in" approach – to return to work part-time at first, and then return to full-time later, or to work remotely from home while she was being treated for cancer.

62.     Counselor Zale simply told her to speak to Talent Team Member Niedbala about her options and, though he was responsible for furthering her career, did nothing to further her career at Defendant.

63.     Plaintiff then informed Talent Team Manager Niedbala that she had cancer and, like she did with Counselor Zale, told her that she would like the accommodation of a phased-in approach of working part-time at first, and then returning to full time later, or to work remotely during this time period.

64.     Talent Team Manager Niedbala said briskly that it would be "too difficult" to find her part-time or phased-in work, or for her to work remotely.  Upon information and belief, Defendant has, does, and can allow employees to work part-time and a phased-in work load, or work remotely.

65.     Talent Team Manager Niedbala told Plaintiff that she could take a Personal Leave of Absence, but this would result in a loss of her health insurance. Another option, she said, would be to apply for short-term disability.

66.     Plaintiff told Talent Team Manager Niedbala that she would apply for short-term disability with the insurance company. However, she told Talent Team Manager Niedbala that if the short-term disability was denied and she was forced to take a Personal Leave of Absence, she was concerned that she would lose her health insurance in the middle of receiving treatment for cancer.

67.     Plaintiff then asked whether a sabbatical might be possible, because on sabbatical she could keep her health insurance, and to Plaintiff's absolute shock, Team Manager Niedbala informed her that she did not qualify for a sabbatical because of the low rating she received at her last performance evaluation.  Plaintiff was shocked that Defendant would allow the impact of the original pregnancy discrimination to snowball so outrageously.

68.     Talent Team Manager Niedbala was utterly unconcerned about the prospect of her losing her health insurance while being treated for cancer, and simply said that these were her options and she had to choose which one to take.

69.     Talent Team Manager Niedbala did not offer any alternative reasonable accommodation or engaged in any form of interactive process to determine a reasonable accommodation for Plaintiff.

11

70.     Plaintiff also told Talent Team Manager Niedbala that she fully intended to get back to work at Defendant after her cancer treatment finished.

71.     Without the accommodation of working part-time and remotely during her treatment, and without the possibility of a sabbatical, Plaintiff had no choice but to return to work on May 7, 2018, apply for short-term disability, and apply for a Personal Leave of Absence in case the short-term disability was denied even though it would have resulted in a loss of her health insurance during her cancer treatment.

**Plaintiff Looks for Projects at Defendant
but Is Denied Because of Her Treatment**

72.     Because Plaintiff was denied her reasonable accommodation and a sabbatical, she returned to work full-time on or about May 7, 2018.

73.     Plaintiff looked desperately for projects to work on, both internal and external but was denied each project.  Upon information and belief, she was denied each project because of her disclosure that she would likely have to receive cancer treatment at some point later that year.

74.     During this time, while Plaintiff was actively looking for project roles for her full-time schedule but was repeatedly denied, Plaintiff continued to ask Talent Team Manager Niedbala for assistance to stagger her return, or, based on Defendant's previous denial of her reasonable accommodation request, how to request additional leave.

75.     Plaintiff did not want to go on additional leave, but understood that Defendant was giving her no other option other than working full-time.

76.      Talent Team Manager Niedbala reiterated Plaintiff's limited options on June 14, 2018, by asking Plaintiff if she planned on taking paid time off, requesting leave or getting staffed on a project.

77.     When Plaintiff specifically requested assistance from Talent Team Manager Niedbala to find a role with a more flexible schedule, a task which belonged to Defendant in its affirmative duty to propose alternative reasonable accommodations and engage in an interactive process, Talent Team Manager Niedbala calously responded that Plaintiff could look at the "job opportunities" webpage.

78.     Due to Defendant's failure to provide a reasonable accommodation and engage in any interactive process with Plaintiff by telling her she could only take paid time off, leave, or work full-time while going through her cancer treatments, Plaintiff was forced to apply for a leave of absence.

**Defendants Wrongfully Deny Plaintiff's Leave of Absence Request**

79.     Left with no other options after Defendant denied Plaintiff's reasonable accommodation request, Plaintiff applied for Short Term Disability Leave and an unpaid Leave of Absense while she waited for her Short Term Disabilty Leave request to be approved by the insurance company.

80.     While waiting for her Short Term Disability Leave to be approved, Defendant premptively denied Plaintiff's unpaid Leave of Absence – before she had even submitted the paperwork requesting the leave.

81.     After back and forth discussions with Talent Team Manager Niedbala about why Defendant denied her unpaid Leave before she even applied, on or about August 6, 2018, Defendant again denied Plaintiff's request for unpaid Leave of Absense.

82.     At this time, Defendant had denied one of the only two alternatives it offered Plaintiff in response to her reasonable accommodation request, further reinforcing its complete failure to engage in any form of interactive process.

**Plaintiff Uses Her Paid Time Off**

83.     Because Defendant denied her unpaid Leave of Absence request, Plaintiff was forced to use her Personal Time Off which she had accumulated over the years from August 7, 2018 to August 13, 2018, due to severe stress and anxiety concerning her job situation and the way she was being discriminated against by Defendant.

**Plaintiff Goes on Short-Term Disability Because of Severe Emotional Distress**

84.     Plaintiff was utterly distressed at the thought of losing her livelihood because of cancer treatment, the potential loss of health benefits, and the pregnancy discrimination she had faced.  She was anxious, she could not sleep, she had panic attacks and she was depressed.

85.     Plaintiff went to the doctor and was diagnosed with anxiety and depression. She then submitted a note to Defendant's Short Term Disability insurance provider detailing her mental health disability.

86.     On August 14, 2018, Defendant's Short Term Disability Leave insurance carrier approved of Plaintiff's request and she went on disability leave.

**Plaintiff Reports the Discrimination to Defendant**

87.     While on disability leave, on or about September 20, 2018, Plaintiff called Defendant's 1-800 hotline for reporting discrimination in the workplace at Defendant.

88.     Plaintiff told the operator that she had been discriminated against because of her pregnancy and her disability. The operator instructed her to submit a report to JC Smith, on the National Talent Team ("Talent Team Member Smith").

89.     Plaintiff returned to work from disability leave on September 21, 2018.

90.     On September 24, 2018, Plaintiff provided Talent Team Member Smith with an

email detailing the events that had taken place:

> Just to give you a bit of background, I'm a Manager in Deloitte's
> Strategy practice and have been with the firm since 2015. I've been
> working in external and internal consulting roles since 2007 and
> have an excellent track record of completing client projects to the
> highest standards. In the recent past, however, I feel that I have
> been discriminated against on the basis of my recent pregnancy and
> most recently my temporary disability following my cancer
> diagnosis.
>
> As a direct result of this discrimination, I have been passed over
> during this year's promotion cycle, suffered a financial loss due
> to the resulting lower bonus compensation, as well as became in
> ineligible to apply for a sabbatical as a result of this.
>
> To give you some more background, in June 2017 I was staffed and
> confirmed to manage an external consulting project with []
> Chemical Company. I have liaised with the project workstream
> leads (Akshay Seshadrinathan and Daniel Herrmann) on this
> project for a while and have been waiting for it to kick off. I was
> informed by Akshay Seshadrinathan by email and by phone that I
> was staffed and should prepare to be on site on 07/10/2017. A few
> days before I was supposed to be on site, I contacted Akshay
> Seshadrinathan to obtain additional information and confirm the
> plan, however, on 07/07/2017 I received an email from Akshay
> Seshadrinathan that I should hold off booking my travel and should
> contact the partner in charge instead. Later that day, I was informed
> by a partner on the project team, that due to my pregnancy they no
> longer wanted to staff me on the project despite of me being fully
> capable to perform all duties to the fullest extent until October or
> beyond if necessary.
>
> Given that I was de-staffed by the project team and not at my own
> request and because discrimination due to pregnancy is against the
> law I never assumed this decision by the project team would have
> any implications on my career. I therefore accepted an internal
> engagement that I completed to the fullest satisfasion of the
> Global strategy team (Lindsay Miller and Ravi Srinivasan).
>
> A few months later, during my annual performance review my
> counselor Joe Zale informed me that because I have only worked

on an internal project - and not the external project I was supposed to have worked on - I was ranked below my peers and therefore was not being promoted. As mentioned, this resulted in an immediate financial loss, impacted my career progression, and also affected my most recent temporary disability.

A few weeks before the birth of my daughter, I was diagnosed with cancer and started the first course of treatment shortly after giving birth during my maternity leave and FMLA. I informed my counselor Joe Zale in April 2018 and we discussed my options so that I can focus on my health and recovery. I was ineligible for a sabbatical due to my performance ranking that resulted from the initial discrimination because of my pregnancy and also had exhausted my FMLA. Therefore, my remaining options were Personal Leave of Absence and short-term disability.

My preference would have been a return to work either part time or in a phased-in approach, but after discussions with Lorin Nieldbala I felt pushed towards a personal leave of absence of short-term disability. I therefore worked with the US Leaves Team (Johnnie Jenkins) to prepare the Personal Leave of Absence application and received approval from Joe Zale. It is important to note that at that point I have not submitted my Personal Leave of Absence application as my short-term disability application was still pending with MetLife.

However, as mentioned above even before I submitted the application to the US Leaves Team and/or the Talent Team, I was informed by Lorin Niedbala by email and Karen Doherty via IM on 07/30/2018 that my application has been denied by the business. After some further confusion, I shared my signed request for Personal Leave of Absence form that I have not previously submitted to the US Leaves Team as requested by both Lorin Niedbala and Karen Doherty. Upon receiving the form, on 08/06/2018, Lorin Niedbala explained that as a result of recent organizational and policy changes my counselor was no longer permitted to authorize a Personal Leave of Absence and that she will speak to the business regarding the possibility for me to take a Personal Leave of Absence while I am awaiting the short-term disability decision (that she previously mentioned has been denied). On 09/05/2018, I was informed by Karen Doherty that my request for Personal Leave of Absence due to my health has been denied. The entire process has caused significant emotional

distress for me and my family. The firm's ignorance of my health and unwillingness to provide me with suitable options to recover feels very clearly like a further discrimination against me as a result of my cancer diagnosis.

Discrimination in the workplace regarding pregnancy and disability is a serious offence. I hope this matter can be resolved soon, to the satisfaction of both parties.

Sincerely,
Yani

91.     Plaintiff provided Talent Team Member Smith with multiple emails to corroborate her claims of pregnancy and disability discrimination. Plaintiff submitted emails establishing that (i) Defendant had sent an email welcoming her to the Chemical Company Project team; (ii) Defendant requested that she complete and submit a security clearance for the Chemical Company Project site; (iii) Plaintiff had submitted her planned vacation schedule for the project for planning purposes; and (iv) that Plaintiff confirmed that she would be able to travel Monday through Thursday and most Fridays despite her pregnancy.

**Defendant's Resulting Report Falsely Exonerates Defendant**

92.     While Defendant allegedly "investigated" Plaintiff's report of discrimination, she continued looking for internal or external projects to join. Plaintiff was unable to find a project despite aggressively pursuing work.

93.     In or about December 2018, Talent Team Member Smith called Plaintiff and shared the outcome of her internal investigation into her claims.

94.     She notified Plaintiff that Defendant had denied any wrongdoing, and the investigation found that there had been no discrimination.

95.     Talent Team Member Smith told Plaintiff that, unbelievably, Defendant claimed that Plaintiff was never confirmed on the Chemical Company Project, that she did not commit to

traveling to the site Monday through Thursday as would be required, and that she declined the project herself because of that reason, all of which were entirely false.

96.     Plaintiff explained how absurd this was, given that she submitted email documentation that she was confirmed by Coordinator Seshadrinathan to be on site, received a "Welcome to the team" email, was asked to hire an additional junior team member for the project, submitted security clearance, gave a schedule to the project leads of her paid time off, and inquired about travel details leading up to her scheduled start.

97.     Talent Team Member Smith also told Plaintiff that her failure to receive a promotion was not discriminatory because she had not showed next level performance.

98.     Plaintiff again told Talent Team Member Smith that she had specifically been informed that the only reason that she had not received the necessary "next level performance" was because she had been taken off the Chemical Company Project due to her pregnancy.

99.     Talent Team Member Smith then shockingly retaliated against Plaintiff by asking Plaintiff if she would consider "resigning" and accepting a "separation package" for leaving the firm.

100.    Plaintiff was shocked and rejected the offer, stating that she wanted to continue working at Defendant.

101.    Talent Team Member Smith ordered Plaintiff to use her Paid Time Off while she considered the separation package.

102.    It was clear that Plaintiff would not be placed on a project and in fact was told by Talent Team member Smith to not look for or try to obtain an assignment.

**Plaintiff Again Reports Discrimination to Defendant**

103.    On or about December 7, 2018, Plaintiff again reported the discrimination to Defendant, writing an email to Talent Team Member Smith, documenting precisely what had occurred with regards to her case. Plaintiff noted that Defendant's "investigation" had found that the Chemical Company Project team had allegedly never confirmed her on the project, that she did not commit to traveling from Monday through Friday, and that she had declined the project herself. Plaintiff wrote that in fact she had submitted email documentation that proved that these findings were entirely false.

104.    Plaintiff reiterated that there was a direct relationship between the denial of her promotion and the fact that she was removed from an external project necessary for a better rating because of her pregnancy.

105.    Plaintiff stated that after consulting with Defendant, she was forced to take Short Term Disability Leave to focus on her health and recovery from cancer because Defendants refused her reasonable accommodation request and left her to decide between Short Term Disability or Unpaid Personal Leave of Absence with no health insurance. However, she stated: "it has now become clear to me that [Defendant] is unwilling to consider my medical situation" and has instead offered a "separation package."

106.    Plaintiff stated, in part:

> I've been working with Deloitte for a few years now and decided to join because of the value I could bring to the firm and its clients but also the opportunities the firm offered me. Over the past year or so I unfortunately had to witness being discriminated against due to my pregnancy which as I laid out led to me being denied my promotion and now again Deloitte [is] not considering my medical circumstances when denying my [Leave of Absence] request. I still believe in all

the reasons why I joined the firm and therefore first hope that Deloitte is able to rectify the events that have happened which would mean we don't have to discuss this any further.

Best regards,
Yani

**Plaintiff is Put on Administrative Leave,**
**and Is Ordered to Pay Back Her Paid Time Off**

107.    On or about February 1, 2019, Plaintiff had an appointment to speak to Talent Team Manager Smith on February 1, but she was forced to cancel the meeting because she was hospitalized.

108.    On or about February 4, 2019, when she returned from the hospital, she attempted to sign in to Defendant's database to record her Paid Time Off, which she had been forced to use at the direction of Talent Team Member Smith, and was not allowed into the database. Confused, she thought perhaps there was a system error, however, after trying several times to log in again, she was shut out of the system each time.

109.    Thereafter, Plaintiff did not receive any additional pay.

110.    On or about February 18, 2019, Plaintiff received an email from Defendant ordering Plaintiff to pay approximately $4,000 to Defendant, monies Defendant claimed Plaintiff owed for allegedly using paid time off that had not accrued.

111.    Plaintiff was shocked by the email because Defendant had been the one to force her to use her Paid Time Off and had forbidden her to work for Defendant.

112.    Plaintiff immediately called Defendant, assuming that there had been some mistake and trying to ensure that Defendant did not continue to "bill her" for her leave.  Plaintiff called the Leaves Team and spoke to Simone (last name unknown).

113.     Simone abruptly advised Plaintiff that she did not understand why [she was] calling because she [was] already on leave" and thus the Leaves Team did not need to work with her any longer.

**Plaintiff's Employment is Terminated from Defendant**

114.     On or about May 5, 2019, Plaintiff received an email that Defendant had officially discontinued her health insurance.

115.     Plaintiff has not received a telephone call, email, postal mail or any other message or notification from Defendant following this date regarding her employment.

116.     Plaintiff understood that Defendant had terminated her employment.

117.     At no point after Plaintiff's meeting with Talent Team Member Smith in December 2018 did Plaintiff request to be on unpaid Leave of Absence or administrative leave, and at no point did Defendants indicate to Plaintiff that she was being put on an unpaid Leave of Absence or Administrative Leave.

118.     At no point after Plaintiff's meeting with Talent Team Member Smith in December 2018 did Plaintiff consent to an unpaid Leave of Absence.

119.     Defendant failed to engange in an form of interactive process regarding a reasonable accommodation regarding Plaintiff's known disability and instead terminated Plaintiff's employment.

120.     Upon information and belief, Defendant terminated Plaintiff's employment because of her disability, and in retaliation for her report of pregnancy and disability discrimination.

## AS AND FOR THE FIRST CAUSE OF ACTION
*(Gender and Pregnancy Discrimination in Violation of Title VII)*

121.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

122.    Defendant has discriminated against Plaintiff on the basis of her gender and pregnancy in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"). Plaintiff has suffered disparate treatment as a result of Defendant's wrongful conduct.

123.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and non-pregnant employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory denial of promotions, disparate terms and conditions of employment on the basis of her sex and pregnancy.

124.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

125.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Retaliation in Violation of Title VII)*

126.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

127.    Plaintiff repeatedly objected to and reported to Defendant about Defendant Deloitte's discriminatory treatment of her.

128.    In retaliation, Defendant subjected Plaintiff to a series of adverse employment

actions including, but not limited to, preventing Plaintiff from performing the duties of her position and a termination of Plaintiff's employment in violation of Title VII.

129.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

130.     As a result of Defendant's conduct alleged in this Amended Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

131.     By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Disability Discrimination in Violation of the ADA)*

132.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

133.     Defendant has discriminated against Plaintiff on the basis of her disability and request for a reasonable accommodation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.,* ("ADA"). Plaintiff has suffered disparate treatment as a result of Defendant's wrongful conduct.

134.     Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated non-disabled employees and failing to provide a reasonable accommodation or engage in an interative process.

135.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

136.    By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the ADA.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*(Retaliation in Violation of ADA)*

137.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

138.    Plaintiff requested a reasonable accommodation for her disability.

139.    Defendant rejected the reasonable accommodation, providing no reason for the denial, and failed to provide a reasonable alternative to the accommodation request.

140.    Plaintiff repeatedly objected to and reported to Defendant about Defendant's discriminatory treatment of her.

141.    In retaliation, Defendant Deloitte subjected Plaintiff to a series of adverse employment actions including, but not limited to, preventing Plaintiff from performing the duties of her position and a termination of Plaintiff's employment in violation of the ADA.

142.    Defendant' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

143.    As a result of Defendant's conduct alleged in this Amended Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

144.    By reason of Defendant's retaliation, Plaintiff is entitled to all remedies available for violations of ADA.

**AS AND FOR THE FIFTH CAUSE OF ACTION**
*(Gender and Pregnancy Discrimination in Violation of the New York City Human Rights Law,*
*and the New York State Human Rights Law)*

145.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

146.     Defendants have discriminated against Plaintiff on the basis of her gender and pregnancy in violation of the New York State Human Rights Law, New York State Executive Law § 296, *et seq.* and the New York City Human Rights Law, the Administrative Code of the City of New York § 8-101, *et seq.* Plaintiff has suffered and disparate treatment as a result of Defendant's wrongful conduct.

147.     Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male and non-pregnant employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory denial of promotions, disparate terms and conditions of employment on the basis of her sex and pregnancy.

148.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

149.     By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law and the New York State Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

**AS AND FOR THE SIXTH CAUSE OF ACTION**
*(Retaliation in Violation of the New York State Human Rights Law*
*and the New York City Human Rights Law)*

150.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

151.     Plaintiff repeatedly objected to and reported to Defendant about Defendant's discriminatory treatment of her.

152.     In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, preventing Plaintiff from performing the duties of her position and a termination of Plaintiff's employment in violation of the New York State Human Rights Law and the New York City Human Rights Law.

153.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

154.     As a result of Defendant's conduct alleged in this Amended Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

155.     By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE SEVENTH CAUSE OF ACTION
*(Disability Discrimination and/or Perceived Disability Discrimination and Retaliation in Violation of the New York State Human Rights Law and the New York City Human Rights Law Against All Defendants)*

156.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

157.     Defendant subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions because of her actual and/or perceived disability in violation of Plaintiff's statutory rights.

158.     Plaintiff repeatedly objected to and reported to Defendant about Defendant's discriminatory treatment of her.

159.    In response to Plaintiff's exercise of her rights under the New York State Human Rights Law and the New York City Human Rights Law, Defendants subjected Plaintiff to a hostile work environment and ultimately terminated Plaintiff.

160.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, loss of sleep, anxiety, has sought out counseling, disruption of her personal life, and the loss of enjoyment of the ordinary pleasure of everyday life.

161.    Accordingly, Defendant's discriminated and retaliated against Plaintiff in violation of her statutory rights as guaranteed by the New York State Human Rights Law and the New York City Human Rights Law.

## **RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant, for all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

(a)    Declaring that by the acts and practices complained of herein, Defendant has violated Title VII, the ADA, New York State Human Rights Law, and New York City Human Rights Law;

(b)    Directing Defendant to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated and do not continue to affect Plaintiff's employment opportunities;

(c)     Directing Defendant to make Plaintiff whole for all earnings she would have received but for Defendant's discriminatory and retaliatory treatment, including but not limited to, lost wages, pension, and other benefits;

(d)     Directing Defendants to pay Plaintiff compensatory damages for her mental anguish, emotional distress, and humiliation;

(e)     Awarding Plaintiff punitive damages as relates to the malicious and willful conduct of Defendant;

(f)     Awarding Plaintiff pre- and post-judgment interest;

(g)     Awarding Plaintiff costs and reasonable attorneys' fees; and

(h)     Granting Plaintiff such other and further relief as this Court deems necessary and proper.

Dated: New York, New York
           June 8, 2021

Respectfully submitted,

GODDARD LAW PLLC
*Attorney for Plaintiff*

By: */s/ Megan S. Goddard*
           Megan S. Goddard, Esq.
           Siobhan Klassen, Esq.
39 Broadway, Suite 1540
New York, NY 10006
 Office: 646-504-8363
Fax: 212-473-8705
Megan@goddardlawnyc.com
Siobhan@goddardlawnyc.com