UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/21/2025

| | |
|---|---|
| YANI ONG, | No. 21-cv-2644 (MKV) |
| Plaintiff, | |
| -against- | OPINION AND ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT |
| DELOITTE CONSULTING, LLP, | |
| Defendant. | |

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Yani Ong brings this action against Defendant Deloitte Consulting LLP asserting claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* (Title VII"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et. seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 *et seq.* ("NYCHRL").  Ong alleges that Deloitte discriminated against her because of her pregnancy, refused to accommodate her when she later became ill with cancer, and retaliated against her after she complained of discrimination. Deloitte seeks summary judgment on all of Ong's claims.  For the reasons set forth below, Deloitte's motion is DENIED in part and GRANTED in part.

## I.    BACKGROUND

### A.  Facts[1]

#### 1.  Ong's Hiring

Plaintiff Yani Ong is a citizen of Indonesia and Great Britain.  Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.

---

[1] The facts are taken from the evidence cited in the parties' Local Civil Rule 56.1 Statements, including the affidavits and declarations submitted in connection with the motion for summary judgment and the exhibits attached thereto [ECF Nos. 82 ("Def. 56.1"), 83 ("Garland Decl."), 84 ("Smith Decl."), 85 ("Zale Decl."), 86 ("Niedbala Decl."), 91 ("Pl. 56.1"), 92 ("Klassen Decl."), 92-1 ("Ong Depo."), 92-2–92-3 ("Niedbala Depo."), 92-4 ("Seshadrinathan Depo."), 92-5 ("Zale Depo."), 93 ("Ong Decl."), 98 ("Garland Supp. Decl."), 100 ("Def. Response to Pl. 56.1"), 103 ("Smith Depo.")]. The facts are undisputed unless otherwise indicated.

She was hired by Defendant Deloitte Consulting LLP in July 2015 to work in its New York City office. Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2. Deloitte is a consulting firm that does projects for "clients in different industries." Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9. Ong moved from Switzerland to New York when she joined Deloitte. Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3. She held a United States Green Card at that time. Pl. 56.1 ¶ 1.1; Def. Response to Pl. 56.1 ¶ 1.1.

Ong was hired as a manager in the Strategy & Operations group, which was later renamed the Strategy & Analytics ("S&A") group. Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2. It is undisputed that Ong's offer letter from Deloitte made clear that Ong "should expect" her assignments to "require travel," which could be unpredictable and conflict with "personal situations," since such required travel would be "based on the needs of the client." Garland Decl., Ex. 7 ("Offer Letter") at 2; Def. 56.1 ¶¶ 4, 5; Pl. 56.1 ¶¶ 4, 5; *see* Ong Depo. at 78:18–21.

There is no dispute that, as a manager, Ong had to seek out and get selected for projects. *See* Def. 56.1 ¶ 11; Pl. 56.1 ¶¶ 9.1, 11; Ong Depo. at 87:4–7; Zale Depo. at 26:6–7. There is also no dispute that the nature of the projects Ong worked on mattered for her performance reviews and, therefore, her eligibility for bonuses and promotion. Specifically, the parties agree that Ong was given "a 'utilization goal' of 80 percent, meaning that 80 percent of her time should be devoted to 'chargeable' (*i.e.*, client service) work," in contrast with internal projects, such as "proposals for business development activities" for Deloitte. Def. 56.1 ¶¶ 9, 10, 18; Pl. 56.1 ¶¶ 9, 10, 18. The parties also agree that performance reviews are based in part on such utilization. *See* Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19; Zale Depo. at 47:15–25.

### 2. Ong's Early Performance

The parties dispute whether Ong underperformed early in her employment. *See* Def. 56.1 ¶ 19–21; Pl. 56.1 ¶ 18.1; Ong Depo. at 102:9–13. In May or June of 2016, Ong requested that

Joseph Zale, a principal in the S&A group, serve as her "Counselor." Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14. A Counselor helps a counselee identify professional development opportunities, collects performance feedback, and provides guidance. Def. 56.1 ¶ 15; Pl. 56.1 ¶ 15. Zale agreed. Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16.

The parties disagree about Ong's performance in the "2017 performance year" (which covered March 2016 to March 2017). Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26. According to Deloitte, "[i]n early 2017, while collecting . . . performance feedback," Zale heard "from other Principals and Senior Managers that Ms. Ong needed to improve her executive presence and communication skills," and Zale agreed with that assessment. Zale Decl. ¶ 3; *see id.*, Ex. 1. According to Zale, Ong "was not meeting expectations" with respect to "creating client and internal relationships." Zale Depo. at 127:14–18. However, Zale testified at his deposition that Ong was "[u]sually . . . seen as hard working" and "strong in doing the actual analysis," among other positive qualities. *Id.* at 96:22–25; *see also* Zale Decl., Ex. 1.

It is undisputed that Lorin Niedbala, a "Talent Business Advisor" who provides "human resources support" to the S&A group, noted in a personnel file (dated April 25, 2017) that Ong "[d]oes very good work" but her "client presence is shaky." Niedbala Decl., Ex. 2.

### 3. Ong's Pregnancy and the Chemical Company Project

It is undisputed that Ong told Zale she was pregnant in March or April of 2017. Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36. Her due date was in November 2017. Def. 56.1 ¶ 57; Pl. 56.1 ¶ 57.

It is undisputed that, after Ong had told Zale she was pregnant, Zale recommended Ong to a senior manager, Akshay Seshadrinathan, who was selecting managers to work on a project for a chemical company in Tennessee (the "Chemical Company Project"). Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37. It is also undisputed that Zale made the recommendation because he thought Ong could "be a

good fit" specifically for "analytics related to pricing."  Zale Depo. at 151:16–22; Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37; *see* Seshadrinathan Depo. at 138:21.  It is undisputed that when Zale recommended Ong to Seshadrinathan, Zale mentioned that Ong was pregnant and that "there was a potential for [her] going on leave."  Def. 56.1 ¶ 39; Pl. 56.1 ¶ 39; Zale Depo. at 106:20–107:20, 159:8–11; *see* Seshadrinathan Depo. at 156:20–25.

It is undisputed that Seshadrinathan reached out to Ong to ask if she was interested and available for the Chemical Company Project.  Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40.  It is also undisputed that, after speaking with Ong, Seshadrinathan told Zale that he thought Ong would be a good fit for the pricing work.  Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Seshadrinathan Depo. at 155:7–11.

As both sides agree, it was originally contemplated that Ong's start date on the Chemical Company Project, if she was selected, would be in mid-May 2017.  Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42; *see* Garland Decl., Ex. 13.  Deloitte contends Ong understood that, if selected, she would be expected to work at the client site in Tennessee four days a week and that remote work was not an option.  *See* Def. 56.1 ¶ 43.  As noted below, Ong offers evidence that, after she was selected for the project, she raised the possibility of some remote work.  *See* Pl. 56.1 ¶ 43.

It is undisputed that, in mid-May 2017, a senior manager informed Ong that they were "still 4-6 weeks away from making final staffing decisions" and that the "work which [they] had thought [she] might be a fit for is going to start later."  Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45; Garland Decl., Ex. 14. Both sides agree that, in early June 2017, Seshadrinathan reached out to Ong to ask if she was still interested and available for the pricing work on the Chemical Company Project.  Def. 56.1 ¶ 47; Pl. 56.1 ¶ 47; Garland Decl., Ex. 15.  The same day, Seshadrinathan sent Ong an email welcoming her to the project and telling her to plan for a "6/19 start (fingers crossed that it won't slip)."

Garland Decl., Ex. 16; Def. 56.1 ¶ 48; Pl. 56.1 ¶ 48.  He told her he "expected the project to run about 12 weeks from when it started."  Seshadrinathan Depo. at 156:7–8.

There is no dispute that Seshadrinathan told Ong that he was considering "exposure to GrowthPath" in selecting managers for the project.  Garland Decl., Ex. 16; Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49.  GrowthPath is a "Deloitte-acquired methodology."  Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50.  There is no dispute that Ong had no experience with GrowthPath at Deloitte; however, Ong contends that GrowthPath "is the same as every other growth strategy," and she had "work[ed] in growth strategy" at a previous job.  Def. 56.1 ¶ 51; Pl. 56.1 ¶ 51; Ong Depo. at 321:6–16.

Both sides agree that, two days after telling Ong to plan for a "6/19 start," Seshadrinathan told Ong that, following a conversation with the client, it was "pretty unlikely" the Chemical Company Project would "start on 6/19."  Garland Decl., Ex. 17; Def. 56.1 ¶ 52; Pl. 56.1 ¶ 52. Soon thereafter, Seshadrinathan asked Ong and another manager to "send" their "planned PTO," meaning paid time off, "for the rest of the year."  Garland Decl., Ex. 18; Def. 56.1 ¶ 54; Pl. 56.1 ¶ 54.  It is undisputed that Ong responded: "It is likely that I will not be able to be on site after 09/22 but should be able to work remotely until ~11/10 if the project goes beyond the October timeline." Garland Decl., Ex. 18; Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.  It is also undisputed that Ong stated she would need "PTO . . . 11/13–TBD."  Garland Decl., Ex. 18; Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56.

The parties agree that Ong did not ultimately work on the Chemical Company Project.  *See* Def. 56.1 ¶ 67; Pl. 56.1 ¶¶ 67, 67.1.  While Deloitte contends that "Ong was not staffed on the Project," Ong contends that she "was removed from the Project on which she had been previously staffed."  Def. 56.1 ¶ 67; Pl. 56.1 ¶¶ 66.4, 67.1.  Furthermore, the parties disagree about why Ong did not work on the Chemical Company Project.

According to Deloitte, both the timeline and the skills required for the Chemical Company Project changed.  *See* Def. 56.1 ¶ 58; Zale Depo. at 169:10–19, 172:22–23.  In particular, first, "the timeline kept slipping" to the point that "a pretty significant portion of the project would be when [Ong] would only be able to work remotely."  Seshadrinathan Depo. at 194:7–10; *see id.* at 194:16–23, 195:20–22 ("she would have actually been remote for at least 50 percent or more of the project"); Zale Depo. at 166:6–7, 255:6–11.  According to Deloitte, this was a problem because the Chemical Company Project "had fairly intensive on-site requirements."  Zale Depo. at 170:10–11.  Second, the focus of the anticipated work "shifted from pricing (where Ong had experience) to GrowthPath (where she did not)."  Def. 56.1 ¶ 58; *see* Seshadrinathan Depo. at 194:4–6; Zale Depo. at 169:13–15.  According to Deloitte, this was a problem "because the client was very insistent that all the managers . . . have a good amount of growth path experience."  Seshadrinathan Depo. at 194:4–6.  Moreover, Zale testified, "with the focus on GrowthPath, there was a concern about Yani being able to do the work."  Zale Depo. at 169:13–15.

According to Deloitte, in late June 2017, Seshadrinathan raised these two concerns about Ong's fit for the Chemical Company Project with Zale.  Def. 56.1 ¶¶ 62, 64.  The parties agree that Zale spoke to Ong in July 2017, but the parties dispute the substance of that conversation.  *See* Def. 56.1 ¶ 66; Pl. 56.1 ¶ 66.  Zale testified that he merely explained that the project was no longer "a good fit," because of the "concern[s] about GrowthPath" and "the need to be on-site every week," but that "[i]t was her decision in terms of her availability to be on the project."  Zale Depo. at 181:14, 181:23, 182:20–21, 182:25–183:2; *see* Def. 56.1 ¶ 66.

Ong disputes Deloitte's account.  Ong contends that she was "taken off the project because [she was] pregnant."  Ong Depo. at 331:3–4.  She testified that Zale "told [her] that [she was] no longer on the project."  *Id.* at 330:14–15.  According to Ong, Zale "said that it was for [her] own

benefit because [she was] pregnant." *Id.* at 330:15–17; *see id.* at 129:12–17 (testifying that Zale "mentioned" that "because of [Ong's] pregnancy it would be better . . . if [she were] not on the project because the project [would be] quite challenging and . . . with the travel and everything he [thought] it [was] best for [her] not to work on the project").

It is undisputed that, in July 2017, Zale wrote in an email to Seshadrinathan that he had spoken with Ong and she "underst[ood] the challenge it would be for her to take this role." Garland Decl., Ex. 19. The evidence from both parties also shows that Zale and Ong discussed finding an "opportunity" for Ong "to kind of work on the project but not be part of the team." Ong Depo. at 331:21–23; *see* Ong Decl. ¶ 9; Garland Decl., Ex. 19 ("She is available and open to supporting the team on a part time basis if useful."). According to Ong, "no one . . . ever got back to [her]" about such an opportunity. Ong Decl. ¶ 9.

It is undisputed that, in place of Ong, Deloitte selected a manager "who had relevant GrowthPath experience and availability" to work on the Chemical Company Project. Def. 56.1 ¶ 68; Pl. 56.1 ¶ 68. It is undisputed that that manager worked on site, in Tennessee, until December 10, 2017. Def. 56.1 ¶ 69; Pl. 56.1 ¶ 69. It is also undisputed that Ong worked on an "internal" project from August through October 2017, although she received utilization credit for that work. Def. 56.1 ¶¶ 70, 71; Pl. 56.1 ¶¶ 70, 71.

### 4.  Ong's Move to London

There is no dispute that, in October 2017, Ong moved to London. Def. 56.1 ¶ 72 ("she and her husband moved to a residence in London"); Pl. 56.1 ¶ 72 ("Undisputed"). There is no dispute that Ong "moved out" of her apartment in New York City and "stopped paying rent." Ong Depo. at 64:20–22, 65:17; *see* Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72. Ong asserts in an affidavit that she "never intended to move to London permanently." Ong Decl. ¶ 2. Rather, Ong asserts, she intended to

return to New York City after her "maternity leave ended." *Id.* However, there is no dispute that Ong remained in London for at least five years and has not had a home in New York City since she left in October 2017. *See* Def. 56.1 ¶¶ 74–76; Pl. 56.1 ¶¶ 74–76.

Deloitte offers evidence of its policy that employees based in the United States "are **strictly prohibited** from" working outside of the United States. Garland Decl., Ex. 21 at 2 (emphasis in original). The policy requires an employee seeking an exception to "obtain pre-approval" from multiple members of the "U.S. Firm leadership." *Id.*

There is no genuine dispute that Ong did not inform Deloitte that she was moving to London, let alone receive approval from the leadership to work there. *See* Def. 56.1 ¶ 83; Pl. 56.1 ¶ 83; Ong Depo. at 142–143, 162:9–16, 162:17–163:14. Ong notes that a "senior manager" on the internal project she was working on from August through October 2017 "was aware that [Ong] was *traveling* to London" in October 2017 and "was fine with it." Ong Depo. at 145:2–6 (emphasis added). The parties agree, however, that Niedbala (the aforementioned "Talent Business Advisor" who provides "human resources support" to the S&A group), and another member of the "Talent" (*i.e.*, human resources) team, Janis Cameron Smith, always "believe[d]" Ong was "based" in New York. Niedbala Depo. at 69:21–23; *see* Smith Decl. ¶ 8 (Ong "never disclosed to me that she was living in London"); Pl. 56.1 ¶ 72.1 ("Neidbala and Smith never understood Plaintiff to be based anywhere except . . . New York City"); Def. Response to Pl. 56.1 ¶ 72.1 ("[Ong] affirmatively misled Deloitte about her whereabouts"). There is no genuine dispute that, while living in London, Ong submitted a form to Deloitte that lists a Brooklyn address at which Ong admits she never lived. *See* Garland Supp. Decl., Ex. 3; Ong Depo. at 63:9–10.

### 5. Ong's PTO, Cancer Diagnosis, and Parental Leave

It is undisputed that Ong stopped working in late October 2017 and used approximately

8

one month of paid time off (which the parties refer to as "PTO," separate from parental leave) in advance of her November 2017 due date. *See* Def. 56.1 ¶ 84; Pl. 56.1 ¶ 84. It is also undisputed that, while pregnant in London, Ong was diagnosed with "recurrent breast cancer." Def. 56.1 ¶ 91; Pl. 56.1 ¶ 91; Ong Depo. at 175:18–21. There is further no dispute that Ong underwent surgery (a lumpectomy) while on parental leave in London. Def. 56.1 ¶ 92; Pl. 56.1 ¶ 92; Ong Depo. at 175:22–25. There is also no dispute that Ong gave birth in mid-November 2017, commenced her approved, fully-paid parental leave, and was expected to return to work on May 7, 2018. Def. 56.1 ¶¶ 73, 85; Pl. 56.1 ¶¶ 73, 85.

### 6. Ong's Communications with Deloitte About her Return and Additional Leave

There is no dispute that, in late April 2018, Ong wrote in an email to Zale that she had "personal/health" issues and was, therefore, "considering" taking "additional leave or stagger[ing] [her] return (part time first before returning full time) or a role that enables [her] to stay relatively local or work remotely . . . ." Garland Decl., Ex. 24; *see* Def. 56.1 ¶ 95; Pl. 56.1 ¶ 95. There is also no dispute that Zale replied that Niedbala wanted to "connect with [Ong] to better understand [her] situation, discuss options and support resolution with the leave team." Garland Decl., Ex. 24; *see* Def. 56.1 ¶ 96; Pl. 56.1 ¶ 96.

It is undisputed that Ong and Niedbala spoke by phone on May 1, 2018, and Niedbala made contemporaneous notes. Def. 56.1 ¶ 97; Pl. 56.1 ¶ 97. It is also undisputed that, during the call, Ong told Niedbala about her cancer diagnosis and need for treatment. Def. 56.1 ¶ 99; Pl. 56.1 ¶ 99. According to Deloitte, Ong also told Niedbala that she wanted to prolong her leave because she wanted more time with her baby. Def. 56.1 ¶ 98. While Ong does not dispute that Niedbala's notes reflect such a statement, Ong denies that she ever "exclusively" wanted to extend her leave to spend time with her baby. Ong Decl. 14; Pl. 56.1 ¶¶ 98, 98.5.

The parties dispute what options Ong and Niedbala discussed.  According to Deloitte, this conversation was driven by Ong's request for additional *leave* following the end of her parental leave.  Deloitte cites Niedbala's notes stating that she advised Ong to speak to "the Leaves Team" about her "new diagnosis and what type of leave coverage she would have for the new diagnosis." Garland Decl., Ex. 26.

Ong, however, maintains that she asked Neidbala for an accommodation to return to work, in contrast with taking more leave.  *See* Ong Depo. at 198:7–10; Pl. 56.1 ¶¶ 98.2.  Specifically, according to Ong, she asked Neidbala if she could either take a "staggered approach," meaning that she would return to work "part time," or "work remotely or . . . anything else."  Ong Depo. at 198:8–10; *see* Pl. 56.1 ¶ 99.1.  Ong contends that she knew of another Deloitte employee who had "returned to work part time [at] first" after taking parental leave, although Ong admits that she knows nothing about the circumstances.  Ong Depo. at 344:9–346:5.  According to Ong, Neidbala simply told her "that it would be very difficult, and [Neidbala] suggested leave."  Ong Depo. at 198:7, 198:11–12; *see* Pl. 56.1 ¶ 99.2.

Deloitte "disputes that Ong ever requested any such accommodation."  Def. Response to Pl. 56.1 ¶ 99.2.  As discussed below, there is no genuine dispute that Ong never submitted a "completed ADA accommodation form," or provided *any* medical documentation related to her cancer diagnosis or treatment, despite Deloitte's repeated requests that she do so.  *See* Def. 56.1 ¶¶ 104, 123, 127, 129, 143, 144, 149; Pl. 56.1 ¶¶ 104, 123, 127, 129, 143, 144, 149; Garland Decl., Ex. 33; Garland Decl., Ex. 40; Garland Decl., Ex. 42.

It is undisputed that, shortly after Ong spoke with Neidbala, in May 2018, Ong spoke with a member of Deloitte's "Leaves Team," Johnnie Jenkins.  Def. 56.1 ¶ 103; Pl. 56.1 ¶ 103.  There is no dispute that Jenkins told Ong that the only paid leave for which she was eligible was "short-

term disability" ("STD") leave.  Def. 56.1 ¶ 104; Pl. 56.1 ¶ 104.  There is also no dispute that Jenkins told Ong that she was "eligible" to apply for STD leave through MetLife, Deloitte's third-party leave of absence ("LOA") administrator, "which was the standard process for seeking a medical LOA."  Def. 56.1 ¶ 104; Pl. 56.1 ¶ 104; *see* Ong Depo. at 206:19–207:4.  Both sides agree that Ong said she understood and would reach out to MetLife.  Def. 56.1 ¶ 108; Pl. 56.1 ¶ 108.  However, Ong asserts that she had "understood" that she would not qualify for such STD leave unless and until she had another surgery scheduled.  Ong Decl. ¶ 15.

The parties agree that Ong also asked Jenkins about the possibility of taking a "personal" (*i.e.*, unpaid) leave of absence.  *See* Def. 56.1 ¶ 105; Pl. 56.1 ¶ 105.  The parties also agree that Jenkins advised Ong that if she were to take such a personal leave of absence, then she would not be eligible for paid STD leave.  *See* Def. 56.1 ¶ 105; Pl. 56.1 ¶ 105.1; Ong Depo. at 207:12–18 ("Johnnie is the one who told me that . . . . once I am on unpaid leave I cannot apply for short-term disability leave").  There is no dispute that, pursuant to Deloitte policy, a personal leave of absence is available only to employees "who do not qualify for a leave under another leave policy or program" and meet certain other criteria.  Def. 56.1 ¶ 106; Pl. 56.1 ¶ 106.

There is no dispute that, days after Ong's May 2018 call with Jenkins, Niedbala initiated an exchange of emails with Ong that continued into July 2018.  Def. 56.1 ¶ 109; Pl. 56.1 ¶ 109; Garland Decl., Ex. 29.  The evidence shows that, when Ong mentioned her impression that no paid leave was available to her, Niedbala responded: "Did they give you details on why there was no more [paid] leave? Did they ask you to submit any paperwork from your doctor? And can you let me know who you spoke with? I will follow up with them directly to see if I can get any additional information from them."  Garland Decl., Ex. 29 at 7.  There is no dispute that Ong also informed Niedbala that she was looking for roles that would "enable [her] to scale back traveling and work

11

remotely/locally," but, if that did not work out, she "would consider to stagger [her] return or take an additional leave of absence." Garland Decl., Ex. 29 at 5; Def. 56.1 ¶ 111; Pl. 56.1 ¶ 111.

There is no dispute that in June 2018, Niedbala sent Ong an email asking: "Are you taking PTO? Have you decided if you are going to request a leave or if you are going to get engaged and get staffed on a project?" Garland Decl., Ex. 29 at 4; Def. 56.1 ¶ 116; Pl. 56.1 ¶ 116. It is undisputed that Ong told Niedbala that she was working on nonbillable "internal proposals and initiatives" but intended to take PTO and, thereafter, "request additional leave." Niedbala Decl., Ex. 6 at 2; Def. 56.1 ¶ 119; Pl. 56.1 ¶ 119. It is undisputed that Ong took PTO in June 2018 and reached out to Niedbala about requesting leave in July 2018. Def. 56.1 ¶¶ 120, 121; Pl. 56.1 ¶¶ 120, 121. It is also undisputed that Niedbala referred Ong back to the Leaves Team. Def. 56.1 ¶ 122; Pl. 56.1 ¶ 122. There is no dispute that, during this time, Ong never initiated a request for paid STD leave through MetLife based on her breast cancer diagnosis, as the Deloitte Leaves Team had advised Ong that she was eligible to do. *See, e.g.*, Ong Depo. at 218:3–8; *see also* Garland Decl., Ex. 29 at 2 (Niedbala emailing a colleague to ask if anyone "from the Leave Team ha[d] heard from [Ong]" and being told, "Call center has no record of her calling, but maybe she called Metlife," and Jenkins would reach out to Ong).

There is no dispute that, in July 2018, Jenkins reached out to Ong and urged her to "contact MetLife, as soon as possible, to initiate a claim for short term disability benefits." Garland Decl., Ex. 33; Def. 56.1 ¶ 123; Pl. 56.1 ¶ 123. There is also no dispute that Ong responded that she was on PTO but had been "advised by the talent team to take [a personal] LOA." Garland Decl., Ex. 34; Def. 56.1 ¶ 124; Pl. 56.1 ¶ 124. It is undisputed that Niedbala then emailed Ong, on July 25, 2018, writing: "I want to make sure that you clearly understand that I have not advised you to take

12

a leave." Garland Decl., Ex. 34 at 2; Def. 56.1 ¶ 126; Pl. 56.1 ¶ 126. It is undisputed that Niedbala

went on to say:

> When we spoke, you indicated that . . . you did not want . . . a client service role. At that time, I did advise you that your various options were to find an internal role (I sent you links to DeloitteNet so you could search to see what was available), I indicated that if you wanted additional leaves time you had to connect directly with the Leaves Team and had to work out options and approval through them (and we did discuss unpaid personal leave as a potential option if approved), and we discussed you taking PTO. But ultimately I told you that you could not remain unstaffed and not working.

Garland Decl., Ex. 34 at 2; Def. 56.1 ¶ 126; Pl. 56.1 ¶ 126.

Deloitte submits unrebutted evidence that, also on July 25, 2018, Jenkins again reached out

to Ong and "explained that she has to initiate a claim with MetLife" and "MetLife approves claims

based on the medical documentation they receive." Niedbala Decl., Ex. 7 at 2.

It is undisputed that in August 2018, Ong made a claim for STD leave through MetLife

based on documentation from a telehealth psychologist in California. Def. 56.1 ¶ 129; Pl. 56.1 ¶

129; *see* Ong. Depo. at 260:21–22 ("I had a call with her, a few calls."). It also undisputed that,

in late September, MetLife retroactively approved that claim from August 7, 2018 to September

21, 2018, with an expected return to work date of September 24, 2018. Def. 56.1 ¶ 130; Pl. 56.1

¶ 130; Garland Decl., Ex. 35.

### 7. Ong's Complaint of Discrimination

It is undisputed that, on September 19, 2018, Ong wrote to Zale that, as a result of the

"process of dealing with [Niedbala]," Ong "got a strong feeling that [she was] being discriminated

against" and it was "not the first time [she] felt like this during [her] tenure with Deloitte." Garland

Decl., Ex. 36; *see* Def. 56.1 ¶ 132; Pl. 56.1 ¶ 132. It is likewise undisputed that Ong also reported

her feeling of discrimination to an internal Deloitte hotline the same day. Def. 56.1 ¶ 133; Pl. 56.1

¶ 133. There is no dispute that, the next day, a member of the Talent Team (*i.e.* human resources),

13

J.C. Smith, reached out to Ong.  Def. 56.1 ¶ 134; Pl. 56.1 ¶ 134.  Ong later responded to Smith

that she felt that she had been discriminated against, based on her pregnancy and cancer diagnosis,

when she was taken off the Chemical Company Project, when she did not receive additional leave,

and in connection with promotion criteria.  *See* Def. 56.1 ¶¶ 135, 137; Pl. 56.1 ¶¶ 135, 137; Smith

Depo. at 113:3–14.

There is no dispute that Smith investigated Ong's complaints of discrimination.  *See* Def.

56.1 ¶ 137; Pl. 56.1 ¶ 137.  There is also no dispute that Deloitte "replenished Ong's PTO bank

(which had been exhausted)," with more than three months of additional paid time off, so that Ong

"could continue to receive full pay during the investigation" without returning to work.  Def. 56.1

¶ 139; Pl. 56.1 ¶ 139; *see* Def. 56.1 ¶¶ 150, 151; Pl. 56.1 ¶¶ 150, 151.

It is undisputed that, by mid-November 2018, Smith determined that no employment

decisions had been made based on Ong's pregnancy, illness, or requests for leave.  *See* Def. 56.1

¶¶ 140, 141; Pl. 56.1 ¶¶ 140, 141; Smith Depo. at 118:24–119:11.  It is also undisputed that, in

mid-November 2018, Smith shared the results of her investigation with Ong.  Def. 56.1 ¶ 142; Pl.

56.1 ¶ 142; Ong Depo. at 287:8–9.

**8.  Subsequent Communications between Ong and Deloitte**

The parties agree that, in late November 2018, while still on paid time off, Ong mentioned

to Smith that she might need time off for doctor's appointments after her return to work.  *See* Def.

56.1 ¶ 143; Pl. 56.1 ¶ 143; Ong Depo. at 281:4–6 (testifying that she was "on PTO at the end of

November 2018").  It is undisputed that, in response, Smith sent Ong an ADA Accommodation

Assessment Form to be completed by her medical provider.  Def. 56.1 ¶ 143; Pl. 56.1 ¶ 143;

Garland Decl., Ex. 40.  It is also undisputed that Smith told Ong that, once she returned the

completed form, Smith would "work with the business to determine what reasonable options may

14

be available." Def. 56.1 ¶ 144; Pl. 56.1 ¶ 144; Garland Decl., Ex. 40.

There is no dispute that Smith also followed up with Ong in early December 2018, writing: "Once you complete the medical documentation to support a request for accommodation, we can reconvene to discuss what reasonable options may be available." Garland Decl., Ex. 41; *see* Def. 56.1 ¶ 146; Pl. 56.1 ¶ 146. It is further undisputed that, soon thereafter, on December 11, 2018, Smith wrote to Ong:

> [W]e can certainly consider your medical situation once you return the ADA form to determine what reasonable options may be available. **In the absence of medical documentation, it will not be possible to continue supporting time off**. You can continue to take PTO as needed through the holidays, and we can regroup the first week of January to determine next steps.

Garland Decl., Ex. 42 (emphasis added); Def. 56.1 ¶¶ 147, 148; Pl. 56.1 ¶¶ 147, 148. There is no dispute that Ong never submitted the completed ADA form. Def. 56.1 ¶ 149; Pl. 56.1 ¶ 149; *see* Ong Depo. 280:16–281:3; Smith Depo. at 152:24–153:18.

It is undisputed that Ong exhausted her replenished allotment of paid time off at the end of January 2019. *See* Def. 56.1 ¶ 151; Pl. 56.1 ¶ 151. It is further undisputed that, as such, Smith scheduled a call with Ong for February 1, 2019 to discuss her next steps. Def. 56.1 ¶ 151; Pl. 56.1 ¶ 151; *see* Garland Decl., Ex. 43. However, as both sides agree, Ong emailed Smith that she could not "dial in to the call as [she] was admitted to hospital." Garland Decl., Ex. 43; Def. 56.1 ¶ 152; Pl. 56.1 ¶ 152. There is no dispute that Smith quickly responded that Ong should "take whatever time [she] need[ed] to get medical care and recover" and encouraged Ong to "contact the Leaves team . . . to discuss [her] options" when she was well enough to do so. Garland Decl., Ex. 43; *see* Def. 56.1 ¶ 153; Pl. 56.1 ¶ 153.

Deloitte offers evidence that it placed Ong on an unpaid administrative leave of absence, effective February 1, 2019, pending the receipt of medical documentation from Ong to support a

medical leave of absence.[2]  Def. 56.1 ¶ 161; Smith Decl. ¶ 5; Smith Depo. at 138:7–12 ("Typically, if someone mentions that they're hospitalized or, you know, considering a medical leave, we try to give an administrative leave until they're able to apply."), 180:11–20 (similar).  Deloitte also offers evidence that Smith made sure such administrative leave would not "impact [Ong's] benefits or PTO accrual."  Smith Decl., Ex. 2; *see id.* Ex. 1; Def. 56.1 ¶ 162.  Ong responds, however, that Deloitte never informed her that she would be responsible for paying her own premiums until she received a document in May 2019 stating that she owed money and her coverage would end.  Ong Decl. ¶ 24.

Ong maintains that there is a dispute as to whether Deloitte merely placed her on unpaid administrative leave while it awaited medical documentation.  *See* Pl. 56.1 ¶ 160.  However, she responds principally that she "never wanted to be placed on unpaid administrative leave" and that she believes Deloitte would have terminated her if she had not filed this lawsuit.  Ong Decl. ¶ 23; Pl. 56.1 ¶ 161.2 (citing Smith Depo. at 214 (testifying: "It's standard practice when an employee doesn't return to work, either because there is no return from leave or job abandonment, that separation would have eventually been discussed.")).

There is no dispute that, although Ong did not tell Smith why she had been hospitalized, Ong was released after a day or two.  Def. 56.1 ¶¶ 155, 156; Pl. 56.1 ¶¶ 155, 156.  There is also no genuine dispute that Smith subsequently reached out to Ong several times, but Ong never responded.  *See* Def. 56.1 ¶¶ 159, 160; Pl. 56.1 ¶¶ 159.1 (quibbling over whether it was multiple phone calls or a couple of emails), 160.  There is also no genuine dispute that, after February 1, 2019, Ong never submitted medical documentation in support of any request for medical leave or

---

[2] Based on the undisputed facts set forth above, it appears that Ong received full pay while performing no billable work for Deloitte for approximately sixteen months from October 2017 to February 2019.

an accommodation through MetLife or Deloitte.  *See* Def. 56.1 ¶ 163; Pl. 56.1 ¶ 163.

According to Deloitte, Ong remains on unpaid administrative leave.  Def. 56.1 ¶ 169.  Ong responds that, once she received a notice that her health insurance was being cancelled based on her nonpayment of premiums, in May 2018, she "understood [her] employment had been terminated."  Ong Decl. ¶ 25.

## B. Procedural History

Ong initiated this action in 2021 by filing the Original Complaint [ECF No. 1].  Deloitte quickly moved to dismiss [ECF No. 9].  Ong, however, filed the Amended Complaint, mooting Deloitte's original motion to dismiss [ECF Nos. 16 ("AC"), 28].

The Amended Complaint asserts seven claims: (1) pregnancy discrimination in violation of Title VII, AC ¶¶ 121–25; (2) retaliation in violation of Title VII, *id.* ¶¶ 126–31; (3) disability discrimination in violation of the ADA, *id.* ¶¶ 132–36; (4) retaliation in violation of the ADA, *id.* ¶¶ 137–44; (5) pregnancy discrimination in violation of the NYSHRL and NYCHRL, *id.* ¶¶145–49; (6) retaliation in violation of the NYSHRL and NYCHRL, *id.* ¶¶ 150–55; (7) disability discrimination and retaliation in violation of the NYSHRL and NYCHRL, *id.* ¶¶ 156–61.

Deloitte then moved to dismiss the Amended Complaint on the ground that Ong had failed to timely initiate this action within the prescribed timeframe after her receipt of a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") [ECF Nos. 18, 19, 20, 27].  Ong opposed that motion [ECF Nos. 24, 25, 26].  The Court denied the motion to dismiss [ECF No. 29] and directed the parties to begin discovery [ECF No. 35].

Thereafter, two years into this case, Ong moved to amend her pleading a second time [ECF No. 39].  Deloitte opposed that motion [ECF No. 43].  The Court denied as futile and untimely Ong's motion for leave to file a second amended complaint [ECF No. 51].

The parties litigated several disputes during discovery, which is now closed [ECF Nos. 52, 76, 77]. Deloitte filed a motion for summary judgment on all of Ong's claims [ECF Nos. 81, 82 ("Def. 56.1"), 83 ("Garland Decl."), 84 ("Smith Decl."), 85 ("Zale Decl."), 86 ("Niedbala Decl."), 87 ("Def. Mem.")]. Ong filed an opposition [ECF Nos. 90 ("Pl. Opp."), 91 ("Pl. 56.1"), 92 ("Klassen Decl."), 92-1 ("Ong Depo."), 92-2–92-3 ("Niedbala Depo."), 92-4 ("Seshadrinathan Depo."), 92-5 ("Zale Depo."), 93 ("Ong Decl.")]. Deloitte filed a reply brief in further support of its motion [ECF Nos. 98 ("Garland Supp. Decl."), 99 ("Def. Reply"), 100 ("Def. Response to Pl. 56.1"), 103 ("Smith Depo.")].

Both parties also move the Court to maintain under seal portions of certain documents they filed in connection with the motion for summary judgment [ECF Nos. 88, 94, 95].

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court "may not make credibility determinations or weigh the evidence." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). It "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Id*. If there is any evidence in the record that supports a reasonable inference in favor of the non-moving party, summary judgment is improper. *See Brooklyn Ctr. For Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 64 (2d Cir. 2021). However, "[a]n adverse party may not rest upon mere conclusory allegations or denials" in a self-serving affidavit that is not supported by any other evidence "to raise a triable issue of material fact." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996); *see United Mag. Co. v. Murdoch Mags.*

*Distribution, Inc.*, 393 F. Supp. 2d 199, 211 (S.D.N.Y. 2005) (a "self-serving" conclusory affidavit will not preclude summary judgment), *aff'd sub nom. United Mag. Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008).

## III.    ANALYSIS

It is clear that material disputes of fact preclude summary judgment on Ong's pregnancy discrimination claims, which arose while Ong was living in New York. However, Ong's claims of disability discrimination (based on Deloitte's alleged failure to accommodate her illness) and retaliation, arose after Ong, a non-citizen, decamped to a foreign country in violation of Deloitte policy and without informing Deloitte. As explained below, the Court concludes that the relevant employment discrimination statutes do not apply extraterritorially in this circumstance. The Court concludes, in any event, that Ong fails to establish a *prima facie* case of disability discrimination, largely because Ong failed *ever* to seek a medical leave of absence based on her cancer diagnosis and need for treatment, or to submit *any* medical documentation of that illness, despite Deloitte repeatedly urging her to do both. With respect to Ong's retaliation claims, which are also barred by the territorial limits of the relevant statutes, the Court concludes that Deloitte is also entitled to summary judgment because there is no evidence of a causal connection between Ong's protected activity and any adverse action.

### A.  Deloitte Is Not Entitled to Summary Judgment on Ong's Pregnancy Discrimination Claims.

Under Title VII, the NYSHRL, and the NYCHRL, discrimination on the basis of pregnancy constitutes discrimination "on the basis of sex." 42 U.S.C. § 2000e(k); *see Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 210 (2015) (Title VII); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 63 (2d Cir. 1995) (NYSHRL); *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 837 (S.D.N.Y. 2013) (NYCHRL). Claims of pregnancy discrimination under Title VII and the NYSHRL are governed

19

by the same standard and are analyzed, together, "using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016) (parallel citations omitted). The NYCHRL, however, sweeps more broadly and requires a separate analysis. *Mihalik v. Credit Agricole Cheuvreux N. America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

### 1. Title VII and the NYSHRL

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Walsh*, 828 F.3d at 75. The plaintiff's burden at this stage is "not onerous." *Id.* (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to proffer "some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (quoting *United States v. Brennan*, 650 F.3d 65, 93 (2d. Cir. 2011)). The burden then shifts back to the plaintiff to demonstrate that the proffered reason for the adverse action was a pretext for discrimination. *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128–29 (2d Cir. 2012).

Deloitte does not dispute that Ong satisfies the first two elements of a *prima facie* case. *See* Def. Mem. at 15. Rather, Deloitte first argues that Ong cannot show that she suffered an adverse employment action. Deloitte argues that Ong "not working on the [Chemical Company] Project" did not constitute a "*materially* adverse change" in the terms and conditions of her employment. Def. Mem. at 15 (emphasis added) (quoting S*anders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)). However, shortly after Deloitte filed this motion for summary

judgment, the Supreme Court decided *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), which altered the standard for assessing whether a plaintiff has suffered an adverse employment action. In *Muldrow*, the Supreme Court held that Title VII requires a plaintiff to show only that she suffered "some 'disadvantageous' change" in her employment. *Id.* at 354. She is not required to show that the disadvantage was "substantial, or any similar adjective." *Id.* at 355. "*Muldrow* therefore overruled [the Second Circuit] precedent, which required" a "materially adverse" change. *Back v. Hapoalim*, 2024 WL 4746263, at *2 (2d Cir. Nov. 12, 2024).

There are disputed questions of fact regarding whether Ong suffered some disadvantageous change in the terms and conditions of her employment because she did not work on the Chemical Company Project. As an initial matter, Deloitte maintains that Ong simply "was not staffed on the Project," Def. 56.1 ¶ 67, and argues that there is never any guarantee that "a particular project will work out" or that a manager "will be selected for a given project," Def. Mem. at 16. Ong, by contrast, maintains that she "was removed from the Project on which she had been previously staffed." Pl. 56.1 ¶¶ 66.4, 67.1. Moreover, Ong maintains that being removed from the Chemical Company Project deprived her of an opportunity to interact with clients and, therefore, to improve, where, the evidence shows, her poor performance made her ineligible for promotions and bonuses. *See* Pl. 56.1 ¶ 66; Pl. Opp. at 10–11. Given *Muldrow's* low standard for an adverse action and Ong's low burden to establish a *prima facie* case, the Court rejects Deloitte's argument that Ong cannot show that she suffered any adverse action.

Deloitte next argues that, even if Ong suffered an adverse employment action, Ong cannot show circumstances giving rise to an inference of discriminatory intent. *See* Def. Mem. at 16–17. Specifically, Deloitte stresses, it is undisputed that Zale recommended Ong for the Chemical Company Project after Ong had told him she was pregnant, and Seshadrinathan moved forward

with selecting Ong knowing she was pregnant.  *See* Def. 56.1 ¶¶ 37, 39, 48; Pl. 56.1 ¶¶ 37, 39, 48. According to Deloitte, Zale and Seshadrinathan later selected someone else, instead of Ong, simply because the timing and the skills needed for the project changed.  *See* Def. Mem. at 16; Def. 56.1 ¶¶ 58, 66.  Deloitte cites authority for the general proposition that "it is difficult to impute . . . an invidious motivation" when the same actors make employment decisions that both benefit and disadvantage the plaintiff.  *Villetti v. Guidepoint Glob. LLC*, No. 21-2059-CV, 2022 WL 2525662, at *4 (2d Cir. July 7, 2022) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)); *see* Def. Mem. at 17.

The "same actor inference" is not sufficient to grant Deloitte summary judgment in this case, however, because Ong offers "evidence affirmatively supporting her claim of [pregnancy] discrimination."  *Villetti*, 2022 WL 2525662, at *4; *cf. Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003).  In particular, Ong testified at her deposition that Zale specifically "told [her] that [she was] no longer on the project . . . . for [her] own benefit *because [she was] pregnant*."  Ong Depo. at 330:14–17 (emphasis added).  According to Ong, Zale commented that the Chemical Company Project would be too "*challenging*" for Ong "*because of [her] pregnancy*."  *Id.* at 129:12–17 (emphases added).  There is no dispute, moreover, that, after speaking with Ong, Zale wrote in an email that Ong "underst[ood] the challenge it would be for her to take this role."  Garland Decl., Ex. 19 (emphasis added).  Drawing all inferences in Ong's favor, that email could be viewed as consistent with her testimony.  *Jaegly*, 439 F.3d at 151.

At trial, a jury could refuse to credit Ong's account of her conversation with Zale.  The jury would be "entitled to rely on the same actor inference," *Villetti*, 2022 WL 2525662, at *4, to weigh that inference together with the testimony of Zale and Seshadrinathan that they selected someone else for the Chemical Company Project for nondiscriminatory reasons, *see* Zale Depo. at 169:10–

19; Seshadrinathan Depo. at 194:4–10, and conclude that the circumstances of Ong not working on the project do not give rise to an inference of discriminatory intent by Deloitte. On summary judgment, however, the Court "may not make credibility determinations or weigh the evidence" and must draw all reasonable inferences in Ong's favor. *Jaegly*, 439 F.3d at 151. Because there is evidence in the record that supports an inference of discriminatory intent, it would be improper to grant Deloitte summary judgment on the ground that Ong failed to establish a *prima facie* case of pregnancy discrimination. *See Brooklyn Ctr. For Indep. of the Disabled*, 11 F.4th at 64.[3]

Deloitte next argues that Ong cannot show pretext. *See* Def. Mem. at 17–18. As noted above, Deloitte offers evidence that it had legitimate, non-discriminatory reasons for removing Ong from (or deciding not to staff her on) the Chemical Company Project. Specifically, Zale and Seshadrinathan testified that the client was "insistent that all the managers . . . have a good amount of growth path experience," which Ong did not. Seshadrinathan Depo. at 194:4–6; *see* Zale Depo. at 169:13–15. Zale and Seshadrinathan further testified that the Chemical Company Project "had fairly intensive on-site requirements," and the timeline for the project had changed such that Ong "would only be able to work remotely" for a very significant portion of the project. Zale Depo. at 170:10–11; Seshadrinathan Depo. at 194:7–10; *see id.* at 194:16–23, 195:20–22; Zale Depo. at. 166:6–7, 255:6–11. Indeed, it is undisputed that the manager who was selected in place of Ong both had GrowthPath experience and worked on site, in Tennessee, for months after the date that Ong had said she could not travel. *See* Def. 56.1 ¶¶ 68, 69; Pl. 56.1 ¶¶ 68, 69.

While a jury might find Deloitte's evidence of legitimate, non-discriminatory reasons for not staffing Ong on the Chemical Company Project compelling, Ong offers enough evidence of

---

[3] Ong also argues that she received a lower performance review because she was pregnant. *See* Pl. Opp. at 13 (arguing that her rating went down even though her utilization score, *i.e.* billable work, went up). While Plaintiff is free to press this argument at trial, the Court does not need to discuss it, since the disputes regarding Ong's removal from the Chemical Company Project alone are sufficient for her pregnancy discrimination claims to survive summary judgment.

pretext to survive summary judgment. As noted above, according to Ong, Zale admitted that Ong was removed from the project was "because [she was] pregnant." Ong Depo. at 330:16–17; *accord id.* at 129:12. Ong also offers evidence that the supposed need for GrowthPath experience was a pretext for that discriminatory decision. In particular, Ong testified that GrowthPath "is the same as every other growth strategy," and she had "work[ed] in growth strategy" at a previous job, so, according to Ong, her lack of experience with GrowthPath itself was not a legitimate reason to remove her from the Chemical Company Project. Ong Depo. at 321:6–16. Ong also points out that Seshadrinathan wrote an email in which he said that staffing Ong on the Chemical Company Project "didn't work out because she wasn't able to travel at the time," omitting any mention of GrowthPath. Klassen Decl., Ex. 9.

There is also some conflicting evidence regarding the issue of Ong's availability to travel. Deloitte maintains that, once the timeline of the project changed, Ong was no longer viable because Ong had made clear that she could not travel beginning in late September 2017 (and could not work at all beginning in mid-November 2017); as such, Ong could not meet the client's "fairly intensive on-site requirements" for too large a percentage of the project, which lasted until mid-December. Zale Depo. at 170:10–11; Def. Mem. at 17; *see* Garland Decl., Ex. 18. However, Ong maintains that Zale said "it would be better" for Ong not to travel "because of [her] pregnancy." Ong Depo. at 129:12–15. In addition, at one point in his deposition, Zale testified that he had given Ong a choice to change her mind about working remotely for the last two months of her pregnancy and go forward with the Chemical Company Project. *See* Zale Depo. at 182:8–10 ("I told her that it was her decision whether she wanted to take the project or not"), 182:20–21 ("[i]t was her decision in terms of her availability to be on the project"), 183:7–8. Elsewhere, however, Zale testified that, in the same conversation, he definitively told Ong "she was not on the project."

*Id.* at 183:11–12; *see id.* at 182:22–24.

The Second Circuit has instructed that a plaintiff may show pretext by citing evidence of "inconsistent explanations" for an adverse decision. *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994). As such, because Ong has met her burdens to establish a *prima facie* case and show pretext, it would be inappropriate to grant summary judgment in favor of Deloitte on Ong's pregnancy discrimination claims under Title VII and the NYSHRL.

### 2. Ong's NYCHRL Pregnancy Discrimination Claim Survives.

As indicated above, the standard for a pregnancy discrimination claim under the NYCHRL is more lenient than the standard for claims under Title VII and the NYSHRL. As such, district courts "must analyze NYCHRL claims separately and independently from any federal and state law claims" and "constru[e] the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109–110 (2d Cir. 2013). Under the NYCHRL, a plaintiff "need only show that her employer treated her less well . . . in part" because of her pregnancy. *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013). Given that Ong's claims under Title VII and the NYSHRL survive summary judgment, her claim under the more favorable NYCHRL also survives. *See Mihalik*, 715 F.3d at 109.

### B. The ADA, NYSHRL, and NYCHRL Do Not Apply Extraterritorially.

#### 1. Federal Law

The Supreme Court has instructed courts to apply a presumption against the extraterritorial application of federal statutes in "all cases." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 261 (2010). It is well-established, moreover, that federal employment discrimination statutes do not apply to non-citizens who are employed outside of the United States. *See Ofori-Tenkorang v.*

*Am. Int'l Grp., Inc.*, 460 F.3d 296, 298 n.2 (2d Cir. 2006).[4]  Indeed, Title VII expressly provides

that it "shall not apply to an employer with respect to the employment of aliens outside any State

. . . ."  42 U.S.C. § 2000e-1(a).  The ADA similarly specifies that "[w]ith respect to employment

in a foreign country, [the] term [employee] includes an individual who *is a citizen* of the United

States."  42 U.S.C. § 12111(4) (emphasis added).  Thus, "non-U.S. citizens working abroad"

generally "fall outside the statutory protections against discrimination" of Title VII and the ADA.

*Torrico v. Int'l Bus. Machines Corp.*, 213 F. Supp. 2d 390, 399 (S.D.N.Y. 2002) (Lynch, J.); *see*

*Kraiem v. JonesTrading Institutional Servs. LLC.*, 492 F. Supp. 3d 184, 194 (S.D.N.Y. 2020);

*Boustany v. Xylem Inc.*, 235 F. Supp. 3d 486, 491 (S.D.N.Y. 2017).

There is no dispute that Ong is not a U.S. citizen.  *See* Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.  There is

also no genuine dispute that Ong moved to London before she was diagnosed with cancer and, as

such, before any claim under the ADA arose.  *See* Def. 56.1 ¶ 72 (Ong "moved"); Pl. 56.1 ¶ 72

("Undisputed").  The parties agree that Ong was not merely visiting London.  *See* Def. 56.1 ¶¶ 72–

76; Pl. 56.1 ¶¶ 72–76.  Ong testified that she "moved out" of her New York apartment and "stopped

paying rent" there.  Ong Depo. at 64:20–22, 65:17.  Moreover, Ong, a citizen of Great Britain,

remained in London for at least five years and has not had a home in New York since she moved.

*See* Def. 56.1 ¶¶ 74–76; Pl. 56.1 ¶¶ 74–76.

Ong argues that, despite her move to London, she remained "a U.S. employee entitled to

the legal protections of the ADA."  Pl. Opp. at 2.  The crux of her argument is that, as far as Deloitte

knew, Ong was still "based" in New York.  Pl. 56.1 ¶ 72.1; *see* Garland Supp. Decl., Ex. 3

(personnel form listing a Brooklyn address when Ong was living in London).  Ong also asserts

---

[4] U.S. E.E.O.C. Guidance, "The Equal Employment Opportunity Responsibilities of Multinational Employers," visited February 25, 2025, *available at* https://www.eeoc.gov/laws/guidance/equal-employment-opportunity-responsibilities-multinational-employers ("U.S. EEO laws do not apply to non-U.S. citizens outside the U.S. or its territories.").

that she "intended to return to New York City" if Deloitte granted her request to work remotely or part time. Ong Decl. ¶ 3; *see* Pl. Opp. at 4.

Federal courts have applied two tests to determine whether a non-citizen is employed in the United States. *Kraiem*, 492 F. Supp. 3d at 197. The court in *Torrico* applied the "center of gravity" test. 213 F. Supp. 2d at 403. That test examines "the 'center of gravity' of the entire employment relationship," in light of the "the totality of circumstances," including:

> where that employment relationship was created and the terms of employment were negotiated; the intent of the parties concerning the place of employment; the actual or contemplated duties, benefits, and reporting relationships for the position at issue; the particular locations in which the plaintiff performed those employment duties and received those benefits; the relative duration of the employee's assignments in various locations; the parties' domiciles; and the place where the allegedly discriminatory conduct took place.

*Torrico*, 213 F. Supp. 2d at 403–04 (emphasis omitted). Other courts have applied the "primary workstation" test, which "focus[es] on the percentage of time" the employee was tasked with being "in a particular location." *Boustany*, 235 F. Supp. 3d at 492.

The Second Circuit has not yet adopted a test for determining when a non-citizen living abroad may nonetheless invoke the protections of U.S. employment discrimination laws. Nor has the Circuit provided guidance on whether this is a question of law, a question of fact, or a mixed question of fact and law. In current times, remote work is increasingly common, and, as such, this issue is likely to be increasingly common.

In this Court's view, neither the center of gravity test nor the primary workstation test applies to this case because, here, there was no mutual understanding between the employer and the employee about the employee's location. Rather, Ong asks the Court to accept the perverse proposition that the center of gravity of an employment relationship or an employee's primary workstation may be wherever an employee *falsely* leads her employer to believe she is located.

*See* Pl. Opp. at 1–6.  Here, the record establishes that Deloitte prohibited its U.S. employees from working abroad, Ong never disclosed to Deloitte that she had moved to London, and, while living in London, Ong submitted paperwork that listed a Brooklyn address in which she admits she never lived.  *See* Garland Decl., Ex. 21; Pl. 56.1 ¶ 72.1; Garland Supp. Decl., Ex. 3.  The Court declines Ong's request to apply an *exception* to the well-settled presumption against the extraterritorial application of federal law where there is no genuine dispute that a non-citizen secretly decamped from the United States to live abroad in violation of "**strict**[]" company policy.  Garland Decl., Ex. 21 at 2 (emphasis in original); *see Morrison*, 561 U.S. at 261.  Rather, the Court relies on the text of the ADA to conclude that, during the period that Ong was employed by Deloitte "in a foreign country," she was not a covered by the ADA because she was not "a citizen of the United States."  42 U.S.C. § 12111(4).

Ong does not fare much better applying the center of gravity test to the undisputed facts.  The first factor the Court considers is where the employment relationship was created and the terms were negotiated.  *Torrico*, 213 F. Supp. 2d at 403.  Since the record establishes that the employment relationship was created in New York, this single, non-dispositive factor favors finding that Ong was employed in the United States.  *See* Garland Decl., Ex. 7 ("Offer Letter").  The next factor is "the intent of the parties concerning the place of employment."  *Torrico*, 213 F. Supp. 2d at 403.  Here, as discussed above, undisputed facts establish that Ong and Deloitte did not have a shared intent, or that Ong's intentions changed during the course of her employment, and she misled Deloitte about her location.

The Court next considers the "locations in which the plaintiff performed . . . duties and received . . . benefits."  *Torrico*, 213 F. Supp. 2d at 403–04.  In her brief, Ong stresses that "the vast majority of the time [she] actually worked, she did so in New York."  Pl. Opp. at 5.  She

incorrectly posits that her location while on "leave, PTO, or STD" is immaterial. *Id.* But the center of gravity test expressly considers *both* where an employee "performed . . duties *and received . . . benefits*." *Torrico*, 213 F. Supp. 2d at 403–04 (emphasis added). There is no dispute that Ong received benefits while living in London, including paid time off, fully-paid parental leave, health insurance, and "PTO accrual." Def. 56.1 ¶ 158; Pl. 56.1 ¶ 158; Ong Depo. at 362:18–363:2. Moreover, there is no dispute that Ong has not performed any work (with one possible exception about which Ong cannot recall any details) in New York since she moved to London. *See* Def. 56.1 ¶ 80; Pl. 56.1 ¶ 80. (Ong did perform some work while in London, although she did so in violation of company policy, further illustrating why this test fits uneasily with this case. *See* Def. 56.1 ¶¶ 83, 119; Pl. 56.1 ¶¶ 83, 119).

The parties dispute Ong's "domicile[.]" *Torrico*, 213 F. Supp. 2d at 404. Ong asserts that she never intended to move to London permanently. Ong Decl. ¶ 2. However, there is no dispute that Ong lived abroad before she started working for Deloitte, has never owned property in New York, has never had a New York driver's license, and has lived in London since moving there in 2017. *See* Def. 56.1 ¶¶ 3, 72, 74–80; Pl. 56.1 ¶¶ 3, 72, 74–80. There is no dispute that Ong was in London when all the "allegedly discriminatory conduct" based upon her illness took place. *Torrico*, 213 F. Supp. 2d at 404; *see* Def. 56.1 ¶ 131; Pl. 56.1 ¶ 131.

Based on these factors, the center of gravity test is inconclusive. But the court in *Torrico* expressly cautioned that its list of factors was "not meant to be exhaustive," and a district court should instead make a determination "based on the totality of circumstances" in the case before it. *Torrico*, 213 F. Supp. 2d at 404. The key circumstance in this case that the *Torrico* factors do not capture, and about which there is no genuine dispute, is that Ong unilaterally and surreptitiously changed the location of her employment during her employment relationship with Deloitte. Ong

speciously protests that, taking the argument against the extraterritorial application of the ADA to its "logical conclusion, a woman who *temporarily*" spends time with family abroad during maternity leave "would forfeit all of her rights under U.S. law." Pl. Opp. at 4 n.3 (emphasis added). Ong's attempt at reductio ad absurdum simply highlights that her case is different in kind. Ong admits she was not merely visiting London but, rather, "moved" there. Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72. Unlike Ong, a woman who *temporarily* visits family abroad does not vacate and cease rent payments on her New York apartment. *See* Ong Depo. at 65:4.

Ong asserts in an affidavit that she "intended to return to New York City" after her maternity leave and "would have rented an apartment in New York City" if Deloitte had granted her a reasonable accommodation. Ong Decl. ¶¶ 2, 3, 5. These are purely conclusory assertions in a self-serving affidavit that are not supported by any other evidence in the record. *See BellSouth Telecommunications, Inc.*, 77 F.3d at 615; *United Mag. Co.*, 393 F. Supp. 2d at 211. Indeed, her statements in the self-serving affidavit she submitted in opposition to the motion for summary judgment are at odds with her sworn testimony at her deposition in this case. Ong admitted at her deposition that she never "ma[d]e any arrangements" in contemplation of returning to New York. Ong Depo. at 67:7–16. Deloitte submits evidence that, by contrast, Ong searched for an apartment in London at least two months before she moved. *See* Garland Supp. Decl., Ex. 1.

In her brief, Ong implausibly asserts that "there is no question that [she] would have returned to New York" if Deloitte had granted her a reasonable accommodation such as "remote work." Pl. Opp. at 4. Ong further asserts that "she was making affirmative attempts to obtain a reasonable accommodation that would allow her to return to New York." *Id.* Ong could have returned to New York at any time, but she chose not to do so, and it strains credulity that Deloitte allowing her to work remotely would have prompted her to traverse an ocean. Ong's wholly

conclusory and self-serving assertions about her intentions are not sufficient to create a triable issue as to whether she was employed "in a foreign country" after she moved to London and made no "arrangements" to return.  42 U.S.C. § 12111(4); Ong Depo. at 67:10.

The Supreme Court has instructed inferior federal courts to apply the presumption against the extraterritorial application of federal statutes in "all cases."  *Morrison*, 561 U.S. at 261.  Ong has not offered any basis to rebut that presumption.  Thus, the Court concludes that Ong cannot invoke the protections of the ADA for any alleged discrimination based on her illness, all of which allegedly took place after she moved to "a foreign country."  42 U.S.C. § 12111(4).  As explained below, the Court concludes that, even if Ong could assert an ADA claim, Deloitte is entitled to summary judgment on that claim.

### 2.  The NYSHRL and NYCHRL

The New York state and city laws require a different analysis, but the result is the same.  A plaintiff who neither lives nor works in New York may invoke the protections of the NYSHRL and NYCHRL if the alleged discrimination had an "impact" in New York.  *Hoffman v. Parade Publications*, 15 N.Y.3d 285, 292, 933 N.E.2d 744 (2010).  In failure-to-hire cases, the New York Court of Appeals has explained, nonresident plaintiffs may invoke the NYSHRL and NYCHRL if they "proactively sought an actual New York City- or State-based job opportunity."  *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 452, 235 N.E.3d 351, 355 (2024).  In *Syeed*, the Court of Appeals explained that refusal to hire such "prospective employee" creates a discriminatory impact in New York "because that is where the person wished to work (and perhaps relocate) and where they were denied the chance to do so."  *Syeed*, 41 N.Y.3d at 453, 235 N.E.3d at 355.

Ong contends that Deloitte's alleged discrimination had an impact in New York "because it prevented Plaintiff from working in New York."  Pl. Opp. at 7.  She contends that she fits within

the holding of *Syeed* because "search[ed] for New York-based projects" while she was living in London.  Pl. Opp. at 8.  Ong's contentions are untenable, however, given the undisputed facts before the Court.  Ong *was* hired to work in New York.  *See* Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.  She later chose to move to London before giving birth to her child and to stay indefinitely thereafter, in violation of "strict[]" company policy.  *See* Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72; Garland Decl., Ex. 21 at 2.  As discussed above, Deloitte did not prevent Ong from returning to New York, where she led Deloitte to believe she remained.  *See* Pl. 56.1 ¶ 72.1 (explaining that, as far as Deloitte HR was concerned, Ong was in New York); Garland Supp. Decl., Ex. 3 (personnel form listing a Brooklyn address where Ong admits she never lived).  Ong could have "relocate[d]" at any time while she was collecting her full salary from her New York-based employer.  *Syeed*, 41 N.Y.3d at 453, 235 N.E.3d at 355.  As discussed above, her self-serving and conclusory assertion that she "intended to return to New York City" is belied by the record, including Ong's own testimony that she never made any arrangements to return.  Ong Decl. ¶ 3; *see* Ong Depo. at 67:10.

The NYSHRL and NYCHRL protect individuals who live or work in New York or who were "discriminatorily denied the opportunity" to work and live in New York.  *Syeed*, 41 N.Y.3d at 454, 235 N.E.3d at 356.  Ong, by contrast, was hired to work in New York but chose to move abroad.  Ong fails to offer a scintilla of evidence that Deloitte's alleged failure to accommodate her had any "impact" in New York beyond her own conclusory and wholly unsupported assertion that she would have returned to New York if Deloitte had granted her requests to work remotely or part time.  *Hoffman*, 15 N.Y.3d at 292, 933 N.E.2d 744; *see BellSouth Telecommunications, Inc.*, 77 F.3d at 615; *United Mag. Co.*, 393 F. Supp. 2d at 211.  As such, the Court concludes that Ong cannot invoke the protections of the NYSHRL and NYCHRL with respect to her failure-to-accommodate claims, and Deloitte is entitled to summary judgment on those claims.

### C. Ong Fails To Establish a *Prima Facie* Case of Disability Discrimination.

The ADA, the NYSHRL, and the NYCHRL require an employer to provide a reasonable accommodation for an employee's disability unless the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); N.Y. Exec. L. 296(3)(a)–(b); N.Y. City Admin. Code §§ 8–107(1)(a), 8-102(18). Courts analyze failure-to-accommodate claims under the ADA, NYSHRL, and NYCHRL using the *McDonnell Douglas* burden-shifting framework. *See Tafolla v. Heilig*, 80 F.4th 111, 118 (2d Cir. 2023); *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016) ("all three statutes" are "analyzed using the burden-shifting scheme"); *see also Kerman-Mastour v. Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 366 (S.D.N.Y. 2011) ("In analyzing whether a plaintiff has raised a triable issue of fact as to whether her termination was motivated by discriminatory animus under the NYCHRL, the courts have continued to employ the familiar burden-shifting analysis of [*McDonnell Douglas*]."). To make out a *prima facie* case of disability discrimination based upon a failure to accommodate, a plaintiff must establish that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Tafolla*, 80 F.4th at 118 (quoting *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).

Ong principally argues that Deloitte failed to "engage in any form of interactive process" about her requests for a reasonable accommodation. Pl. Opp. at 15; *see id.* at 14–17. Ong asserts that Deloitte "told her conclusively that there were no remote or part-time positions available, even though Plaintiff [k]new of another employee who was granted part-time work upon return from maternity leave." *Id.* at 15. Ong further asserts that Deloitte "pretended that it was engaging in

33

the interactive process, but really was forcing Plaintiff to work with no accommodation . . . ." *Id.* According to Ong, this "warrant[s] a finding of discrimination under the ADA." *Id.*

It is well-settled that "[t]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 98 (2d Cir. 2015) (quoting *Jackan v. N.Y.S. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)). However, "the ADA's interactive process requirement" is not "an end in itself." *Id.* (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)). As such, "the ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided" or offered "to the employee were plainly reasonable." *Id.* Moreover, "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Id.* at 95. Indeed, where an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the [offered] accommodation is 'plainly reasonable.'" *Id.* at 94.

The undisputed facts here establish that Deloitte did engage in the interactive process required by the ADA. "An employer engages in an interactive process by, for example, 'meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome.'" *Sheng v. M&TBank Corp.*, 848 F.3d 78, 87 n.3 (2d Cir. 2017) (quoting *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218–19 (2d Cir. 2001)). There is no genuine dispute that Deloitte took such steps.

34

In particular, it is undisputed that, when Ong told Zale that she had "personal/health" issues, Zale replied that Niedbala wanted to "connect with [Ong] to better understand [her] situation, discuss options and support resolution . . . ."  Garland Decl., Ex. 24; *see* Def. 56.1 ¶ 96; Pl. 56.1 ¶ 96.  It is undisputed that, shortly thereafter, Niedbala spoke with Ong by phone about her options.  *See* Def. 56.1 ¶¶ 97–102; Pl. 56.1 ¶¶ 97–102.  There is also no dispute that Deloitte then connected Ong with a member of its Leaves Team, Johnnie Jenkins, who advised Ong that she was "eligible" to apply for paid STD leave through MetLife, "which was the standard process for Deloitte professionals seeking a medical leave of absence."  Def. 56.1 ¶ 104; Pl. 56.1 ¶ 104.

The opportunity to take a paid leave of absence while undergoing treatment for cancer is plainly a reasonable accommodation.  *See Romanello v. Shiseido Cosms. America Ltd.*, 2002 WL 31190169, at *9 (S.D.N.Y. Sept. 30, 2002) ("A leave of absence is one form of reasonable accommodation."), *aff'd*, 71 F. App'x 880 (2d Cir. 2003); *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 199 (S.D.N.Y.1999).  Crucially, however, it is undisputed that Ong *never* applied for paid STD leave based on her cancer diagnosis and need for treatment, nor did she ever complete an ADA accommodation form with medical documentation for that diagnosis and treatment.  *See* Def. 56.1 ¶¶ 129, 149; Pl. 56.1 ¶¶ 129, 149.  Rather, months after Deloitte advised her of this potential accommodation, Ong applied for (and received) STD leave based only on documentation from a telehealth psychologist in California.  *See* Def. 56.1 ¶ 129; Pl. 56.1 ¶ 129.

Ong contends that she had "understood" that she would not qualify for STD leave based on her "cancer alone," without another surgery scheduled.  Ong Decl. ¶ 15.  Ong does not assert that anyone at Deloitte told her that she would not qualify for STD; rather, she asserts only that that was her understanding.  *See* Pl. 56.1 ¶ 110.1 ("Plaintiff understood that there was no 'paid' leave available.").  Indeed, Deloitte submits evidence that when Ong mentioned this impression to

Niedbala via email in early May 2018, Niedbala responded: "Did they give you details on why there was no more [paid] leave? Did they ask you to submit any paperwork from your doctor? And can you let me know who you spoke with? I will follow up with them directly to see if I can get any additional information from them."  Garland Decl., Ex. 29 at 7.

There is no dispute that, thereafter, Deloitte repeatedly urged Ong to reach out to MetLife with medical documentation to initiate a claim for paid leave.  For example, in July 2018, Jenkins urged Ong to "contact MetLife, as soon as possible, to initiate a claim for short term disability benefits."  Garland Decl., Ex. 33; *see* Def. 56.1 ¶ 123; Pl. 56.1 ¶ 123.  Later, Jenkins again spoke with Ong "and explained she has to initiate a claim with MetLife" which "approves claims based on medical documentation."  Niedbala Decl., Ex. 7; *see* Def. 56.1 ¶ 127; Pl. 56.1 ¶ 127.

While the reason Ong failed to apply for paid STD leave based on her cancer diagnosis and treatment is not material to the Court's analysis, it is difficult to ignore that the required medical documentation would have come from doctors in London, where, unbeknownst to Deloitte, Ong was living, was diagnosed, and had received treatment.  *See* Def. 56.1 ¶¶ 91, 92, 131; Pl. 56.1 ¶¶ 91, 92, 131.  Regardless, as part of the interactive process to make a reasonable accommodation, an employer is entitled to request medical documentation.  *See Quadir v. New York State Dep't of Labor*, 2016 WL 3633406, at *4 n.3 (S.D.N.Y. June 29, 2016) (collecting cases).  Where, as here, undisputed facts demonstrate that a plaintiff declined to engage in the interactive process by refusing to provide medical documentation, the employer cannot be liable for failing to accommodate her disability.  *See Robinson v. American Int'l Grp. Inc.*, 2009 WL 3154312, at *6–7 (S.D.N.Y. Sept. 30, 2009); *see also Economou v. Caldera*, 2000 WL 1844773, at *23 (S.D.N.Y. Dec. 18, 2000), *aff'd*, 286 F.3d 144, 150 (2d Cir. 2002).

Ong insists that Deloitte should be held liable for discrimination because, according to Ong, Deloitte "outright" rejected her requests for remote or part-time work and told Ong that "her *only* option . . . was some type of leave." Pl. Opp. at 14, 15 (emphasis in original). Ong is wrong on the law and wrong in her characterization of the undisputed facts. Deloitte was not required to offer Ong her most "preferred" accommodation, but only a reasonable accommodation. *See Noll*, 787 F.3d at 95. The undisputed facts are that Deloitte offered Ong the plainly reasonable option to seek paid medical leave based on her cancer diagnosis, but, for whatever reason, Ong demurred. *See* Def. 56.1 ¶¶ 104, 123, 127, 163; Pl. 56.1 ¶¶ 104, 123, 127, 163. As the Second Circuit has made clear, Deloitte was not required "to explore alternative accommodations" after it had offered Ong a "plainly reasonable" option. *Noll*, 787 F.3d at 98.

Moreover, Ong's assertion that another woman was allowed to work part-time, Ong Depo. at 344:11–18, is immaterial. Ong admits that she does not know "anything at all" about "how it was determined that [this other woman] would be able to work part time." Ong Depo. at 345:7–19. As such, Ong clearly cannot offer evidence that she and the other woman were similarly situated in all material respects, as would be required to support an inference of discrimination. *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

Nevertheless, undisputed facts show that Deloitte did explore alternatives with Ong. There is no dispute that Niedbala sent Ong an email making "clear" that Neidbala was not pressing Ong "to take a leave" and reiterating that Ong had "various options," including "an internal role," PTO, and paid or unpaid leave, subject to approval. Garland Decl., Ex. 34. There is no dispute that both the Talent and Leaves Teams continued to interact with Ong about her options over the course of many months. *See* Def. 56.1 ¶¶ 109–130; Pl. 56.1 ¶¶ 109–130. In light of the undisputed facts, Ong cannot establish a *prima facie* case that Deloitte "refused" to offer her any reasonable

accommodation. *Tafolla*, 80 F.4th at 118. Accordingly, even if Ong is entitled to extraterritorial statutory protection, Deloitte is nonetheless entitled to summary judgment on Ong's claims of disability discrimination under the ADA and NYSHRL.

The Court reaches the same conclusion with respect to the NYCHRL. "The standard under the NYCHRL is liberal, but not boundless." *Nieblas-Love*, 165 F. Supp. 3d at 74 (quoting *LeBlanc v. United Parcel Serv.*, 2014 WL 1407706, at *13 (S.D.N.Y. Apr. 11, 2014)). "Even under its permissive standard, a plaintiff must still establish a *prima facie* case." *Id.* Here, as discussed above, Ong cannot establish a *prime facie* case that Deloitte refused to offer her a reasonable accommodation when undisputed facts show that Ong refused to engage in the interactive process by refusing to apply for paid medical leave of absence. *See Robinson*, 2009 WL 3154312, at *6–7; *Economou*, 2000 WL 1844773, at *23.

### D. Deloitte Is Entitled to Summary Judgment on Ong's Retaliation Claims.

Retaliation claims under Title VII, the ADA, the NYSHRL, and the NYCHRL are assessed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Maynard v. Montefiore Med. Ctr.*, No. 18-cv-8877 (LAP), 2021 WL 396700, at *6 & n.8 (S.D.N.Y. Feb. 4, 2021) (collecting cases). With respect to the NYCHRL, there is a more liberal standard of proof as to certain elements. *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020).

To establish a *prima facie* case, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took an adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). With respect to the last element, the federal and state laws require "but-for causation," *i.e.*, "proof" that the adverse

action "would not have occurred" if not for the plaintiff's protected activity. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 340 n.22 (S.D.N.Y. 2020) (explaining that the NYSHRL requires but-for causation and collecting cases). Under the less-stringent NYCHRL, "summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." *Mihalik*, 715 F.3d at 116.

As explained above, the Court concludes that these statutes do not apply extraterritorially. *See supra* at 25–32. There is no dispute that Ong's protected activity took place nearly one year after she moved to a foreign country. *See* Def. 56.1 ¶¶ 72, 132, 133; Pl. 56.1 ¶¶ 72, 132, 133. As such, on that basis alone, the Court concludes that Deloitte is entitled to summary judgment on Ong's retaliation claims. The Court further concludes that Ong fails to establish a *prima facie* case of retaliation, as explained below.

There is no dispute that Ong engaged in protected activity. Specifically, on September 19, 2018, while living in London, Ong wrote to Zale that, as a result of the "process of dealing with [Niedbala]," Ong "got a strong feeling that [she was] being discriminated against" and it was "not the first time [she] felt like this during [her] tenure with Deloitte." Garland Decl., Ex. 36; *see* Def. 56.1 ¶ 132; Pl. 56.1 ¶ 132. Ong also reported her feeling of discrimination to an internal Deloitte hotline the same day. Def. 56.1 ¶ 133; Pl. 56.1 ¶ 133. In a later exchange with a member of the Talent Team (*i.e.*, human resources), Ong cited being removed from the Chemical Company Project, not receiving additional leave, and "promotion criteria." Def. 56.1 ¶ 137; Pl. 56.1 ¶ 137; Smith Depo. at 113:3–14.

There is no dispute that Deloitte responded to Ong's complaint by starting an investigation and replenishing Ong's "PTO bank (which had been exhausted)," with several months of PTO, so

that Ong could continue to receive full pay during the investigation without returning to work. Def. 56.1 ¶¶ 137, 139; Pl. 56.1 ¶¶ 137, 139. It is also undisputed that, by mid-November 2018, Smith determined that no employment decisions had been made based on Ong's pregnancy or cancer diagnosis and shared that determination with Ong. Def. 56.1 ¶¶ 141, 142; Pl. 56.1 ¶¶ 141, 142; *see* Smith Depo. at 118:2–119:11.

It is undisputed that, later in November 2018, Smith sent Ong an ADA Accommodation Assessment Form to be completed by her medical provider, and Smith told Ong that, once she had medical documentation, she would "work with the business to determine what reasonable options may be available." Garland Decl., Ex. 40; *see* Def. 56.1 ¶¶ 143, 144; Pl. 56.1 ¶¶ 143, 144. It is undisputed that, in December 2018, Smith again reached out to Ong, writing: "Once you complete the medical documentation to support a request for accommodation, we can reconvene to dismiss what reasonable options may be available." Garland Decl., Ex. 41; *see* Def. 56.1 ¶ 146; Pl. 56.1 ¶ 146. The parties agree that, soon thereafter, Smith stressed to Ong that "in the absence of medical documentation, it will not be possible to continue supporting time off." Garland Decl., Ex. 43; *see* Def. 56.1 ¶ 147; Pl. 56.1 ¶ 147. It is undisputed that Ong never returned the completed ADA Form to Smith, or anyone else at Deloitte. Def. 56.1 ¶ 149; Pl. 56.1 ¶ 149.

The parties agree that the additional paid time off Deloitte extended to Ong was exhausted by the end of January 2019. *See* Def. 56.1 ¶ 151; Pl. 56.1 ¶ 151. As such, Smith and Ong had a called scheduled for February 1, 2019, but Ong cancelled the call because she had been admitted to the hospital. Def. 56.1 ¶ 152; Pl. 56.1 ¶ 152. There is no dispute that Smith responded that Ong should "take whatever time [she] need[ed] to get medical care and recover" and then reach out to the Leaves Team. Def. 56.1 ¶ 153; Pl. 56.1 ¶ 153; Garland Decl., Ex. 43.

According to Deloitte, it then placed Ong on an unpaid administrative leave of absence, pending receipt of medical documentation from Ong to support a medical leave of absence. Def. 56.1 ¶ 161; *see* Smith Depo. at 127:11–24. Unrebutted evidence shows that Smith reached out to Ong several times to follow up. Smith Depo. at 138:18–20. There is no dispute that, after February 1, 2019, Ong never submitted medical documentation in support of any request for medical leave or an accommodation. *See* Def. 56.1 ¶ 163; Pl. 56.1 ¶ 163. There is also no dispute that Ong never again contacted Smith. Def. 56.1 ¶ 160; Pl. 56.1 ¶ 160.

Ong contends that Deloitte placed her on indefinite, unwanted, unpaid leave in retaliation for her complaint of discrimination. Pl. Opp. at 21–21. But Ong offers no evidence of any causal connection between Ong's complaint and her placement on unpaid leave. The temporal proximity between her September 2018 complaint and her February 2019 placement on unpaid leave might, on a different record, support an inference that her protected activity was a cause of an adverse action. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). However, as recited above, it is undisputed that Deloitte had already extended Ong months of paid time off, exceeding the time Deloitte needed to complete its investigation, and had repeatedly entreated Ong to submit medical documentation to support either a paid medical leave of absence or an accommodation. *See* Def. 56.1 ¶¶ 139, 143, 144, 147; Pl. 56.1 ¶¶ 139, 143, 147. It is also undisputed that Deloitte had warned Ong that it could not continue to extend her paid time off "in the absence of medical documentation." Garland Decl., Ex. 43; *see* Def. 56.1 ¶ 147; Pl. 56.1 ¶ 147. Deloitte maintains that its legitimate, non-discriminatory reasons for placing Ong on unpaid leave were that she had exhausted her PTO, and Deloitte was awaiting medical documentation to support a medical leave of absence. *See* Def. 56.1 ¶ 161; *see* Smith Depo. at 127:11–24. Ong

41

offers no evidence to rebut these reasons, and "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847.

Moreover, Ong stresses that placing her on "indefinite, unpaid administrative leave" was an adverse action. Pl. Opp. at 19 (citing *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 583 (S.D.N.Y. 2008)). However, undisputed facts establish that Deloitte tried to limit the duration of the unpaid leave. It is undisputed that, upon learning of Ong's hospitalization, Smith encouraged Ong to reach out to the Leaves Team about her options once Ong was well enough to do so, but Ong did not do that. *See* Def. 56.1 ¶¶ 153, 163; Pl. 56.1 ¶¶ 153, 163. It is also undisputed that Smith later reached out to Ong several times to follow up, but Ong never responded. *See* Def. 56.1 ¶¶ 159, 160; Pl. 56.1 ¶¶ 159, 160. The Court is not unsympathetic to the difficulties that Ong faced, but the record establishes that she refused to engage with Deloitte in a process to limit the duration of her unpaid leave.

Accordingly, because Ong offers no evidence that Deloitte would not have placed Ong on unpaid leave but for her complaint of discrimination, the Court concludes that Deloitte is entitled to summary judgment on Ong's retaliation claims under Title VII, the ADA, and the NYSHRL. *See Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 360. Further, because Ong offers no evidence that retaliation played any part Deloitte's decision to place her on unpaid leave, the Court concludes that Deloitte is entitled to summary judgment on Ong's retaliation claim under the NYCHRL. *See Mihalik*, 715 F.3d at 116.

### E. Sealing

Both parties have filed sealing motions [ECF Nos. 88, 94]. Deloitte has filed exhibits that contain redactions and requests that the Court maintain the unredacted versions of those exhibits under seal. Specifically, Deloitte seeks approval for its new redactions of a client's name and notes

that certain documents had already been redacted during discovery to remove client information and personally identifying information about non-parties [ECF No. 88]. Ong filed a letter seeking to redact a "confidential portion" of certain deposition testimony, which Ong filed unredacted on the public docket [ECF No. 94].

The exhibits in question are judicial documents which are subject to the common law and constitutionally-rooted presumption of public access. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Any sealing must be "narrowly tailored" to preserve privacy interests that outweigh the public interest. *See id.*

Deloitte's sealing motion is DENIED without prejudice to renewal. The client name in question appears, unredacted, in filings on the public docket. Deloitte has made no showing that its redactions of the client name preserve any existing privacy interest. Accordingly, by March 26, 2025, Deloitte must file either unredacted versions of its exhibits, or more narrowly redacted versions of its exhibits together with a letter that justifies its redactions. The redactions that were made during discovery to remove client information and personally identifying information about non-parties may remain in place. Ong's sealing motion is DENIED because she publicly filed the testimony she seeks to redact.

## IV.    CONCLUSION

For the reasons set forth above, the motion of Deloitte for summary judgment is DENIED in part and GRANTED in part. The motion is denied with respect to Ong's claims of pregnancy discrimination in violation of Title VII, the NYSHRL, and the NYCHRL. The is granted as to all of Ong's other claims.

Deloitte's motion to seal is DENIED without prejudice to renewal by March 26, 2025. Ong's motion to seal is DENIED.

The Clerk of Court respectfully is requested to terminate the motions pending at docket entries 81, 88, and 94.  The Court will issue a separate order scheduling a jury trial.

**SO ORDERED.**

**Date:  March 21, 2025**
**New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**